IN THE MATTER OF THE ARBITRATION BETWEEN:

**The Ohio Valley Coal Company Powhatan No. 6 Mine**

-and-

**United Mine Workers of America, District 31, Local Union 1810**

**ARB Case #:** 16-31-17-021

**Grievance No.** 17-31-04

**Grievants:** Tom Holland & Mike Horstman

**ARBITRATOR:**   Mollie H. Bowers

**APPEARANCES:**

    **For the Company:**   Kenneth Eller, Esq., Consultant

    **For the Union:**   Rick Altman, UMWA, Sub 6 Office

The United Mine Workers of America, District 31, Local Union 1810 (the Union) brought this matter to arbitration for adjudication of its claim that management of The Ohio Valley Coal Company Powhatan No. 6 Mine (the Company) violated the 2016 National Bituminous Coal Wage Agreement (the NBCWA) when it contracted out bargaining unit work. The Hearing was held on September 20, 2017, at the Springhill Suites in Wheeling West Virginia. Both parties were represented.

At the outset of the Hearing, the Company raised a threshold challenge to the substantive arbitrability of this matter. It also asked that the proceedings be bifurcated so that the question of arbitrability could be decided before the merits of the case were heard. It acknowledged, both orally and in its written statement, that if the case was deemed to be arbitrable, then it did not contest the Union's claim on the merits. Based upon this information, the Arbitrator determined that it was appropriate to bifurcate the proceedings. The Union asked that the Arbitrator retain jurisdiction when she issued her decision.

## ISSUE

As a consequence of the foregoing ruling by the Arbitrator, she has determined that the issue to be decided here shall be stated as:

> Is the subject matter of this grievance arbitrable in terms of the contract and the case law?



## PERTINENT CONTRACT LANGUAGE

**Article I - Enabling Clause**

. . .

This Agreement shall be binding upon all signatories thereto, including those Employers which are members of signatory associations, and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its **operations** covered by this Agreement shall not be sold, conveyed, or otherwise transferred . . . (emphasis added)

. . .

**Article IA - SCOPE AND COVERAGE**

Section (a) **Work Jurisdiction**

The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway or rail not owned by the Employer), repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above shall be performed by classified Employees of the Employer covered by and in accordance with the terms of this Agreement. Contracting, subcontracting, leasing and subleasing, and construction work, as defined herein, will be conducted in accordance with the provisions of this Article.

. . .

Section (f) **Application of This Contract to the Employer's Coal Lands**

As part of the consideration for this Agreement, the Employers agree that this Agreement covers the operation of all the coal lands, coal producing and coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this Agreement) be put into production or use. This section will immediately apply to any new operations upon the Union's recognition, certification, or otherwise properly obtained bargaining rights. . . .

Section (g) **Contracting and Subcontracting**

2

...

    (2) Repair and Maintenance Work -- Repair and maintenance work of the type customarily performed by classified Employees at the mine or central shop shall not be contracted out except (a) where the work is being performed by a manufacturer or supplier under warranty, . . .; or (b) where the Employer does not have available equipment or regular Employees (including laid-off Employees at the mine or central shop) with necessary skills available to perform the work at the mine or central shop.

Section (i) **Construction Work**

    All construction of mine or mine related facilities including the erection of mine tipples and sinking of mine shafts or slopes customarily performed by classified Employees of the Employer normally performing construction work in or about the mine in accordance with prior practice and custom, shall not be contracted out at any time unless all such Employees with necessary skills to perform the work are working no less than 5 days per week, or its equivalent for Employees working on alternative schedules.

...

**Article XXIII - SETTLEMENT OF DISPUTES**

...

Section (c) **Grievance Procedure**

...

    (2) If no agreement is reached between the Employee and his foreman, the complaint shall be submitted on the BCOA-UMWA Standard Grievance Form and shall be taken up within five working days of the foreman's decision by the Mine Committee and mine management. . . . Within five working days after the complaint is taken up by them, the committee and management will complete the standard grievance form and, if the complaint is not settled, the grievance shall be referred to a representative of the UMWA district, designated by the Union, and a representative of the Employer.

    (3) Within seven working days of the time the grievance is referred to them, the district representative and the representative of the Employer shall meet and review the facts and pertinent contract provisions in an effort to reach an agreement. . . .

...

**Article XXVI - DISTRICT AGREEMENTS**

Section (b) **Past Practice and Custom**

This Agreement supersedes all existing and previous contracts except as incorporated and carried forward herein by reference; and all local agreements, rules, regulations and customs heretofore established in conflict with this Agreement are hereby abolished. Except where abolished by mutual agreement of the parties, including the provisions of Article II G.10 of this Agreement, all prior practices and custom not in conflict with this Agreement shall be continued, but any provisions in any District or local agreements providing for the levying, assessing or collection of fines or providing for "no-strike," "indemnity," or "guarantee" clauses or provisions are hereby expressly repealed and shall not be applicable during the term of this Agreement. Whenever a conflict arises between this Agreement and any District or local agreement, this Agreement shall prevail.

## FACTS

The Employer provided an undisputed history of the Powhatan No. 6 mine dating back to 1972, when this location was developed and operated by The North American Coal Corporation (NACCO) for sixteen years as a conventional/continuous underground mining operation. In 1987, management of NACCO decided to exit from the bituminous coal business and plans began to close the mine permanently by 1988. At that juncture, Robert Murray was a Vice President at NACCO, disagreed with this decision and, in May of 1988, through a company he established, Ohio Valley Resources (OVR), purchased the Powhatan No. 6 mine. Subsequently, this company became The Ohio Valley Coal Company (TOVCC) which signed, as a party to the NBCWA, and as a successor employer to same, covering the former employees of NACCO.

In 1989, the Powhatan No. 6 mine was converted to a longwall mining system (LMS) to make production more efficient and cost effective for competitive purposes. Employees who worked under the previous operation were redirected to work on gate and main entries and on infrastructure to facilitate longwall mining in new areas. There is no dispute that the number of employees who have worked at the Powhatan No.6 has decreased

4

markedly over the years to the point that only sixteen classified employees remained when the instant grievance was filed.

Effective on October 16, 2016, all coal production at the mine ceased permanently and the mine was sealed. There is no disagreement that assets of the mine were sold.

The Company owns a nearby sister, non-union mine. Since the Powhatan No. 6 mine stopped producing coal and was sealed, the Company has been sending coal waste from the adjacent mine to the Powhatan property where it is contained in an existing catch basin that is being enlarged to accommodate more of this waste. The Grievants have been repairing and maintaining the heavy equipment used to keep up and to increase the size of the catch basin to contain the coal waste.

On March 15, 2017, the Union filed a grievance complaining that:

> On 03-09-17 Company violated Art IA, Sec. g-2, XXVI, Sec. b an other pertinent provisions of the contract. Company had dozer taked out for repairs at 6m. This is our work we have always done. Asking be made whole in all maters an cease in disist from this action or practice.

The parties were unable to reach a mutually acceptable agreement that would resolve this matter. The grievance was advanced to arbitration. The threshold question of whether the subject matter of this grievance is arbitrable is before this Arbitrator for decision.

### POSITIONS OF THE PARTIES

**Company Position:**

The Company's position is straight forward. The linchpin is the contract language coupled with numerous court decisions and arbitration awards supporting its interpretation of same. The Company contends that the language contained in Article IA, Section (a) of the NBCWA, "The production of coal" explicitly and exclusively pertains to an

5

active, operating mine that is producing coal; an "operation". This distinctly distinguishes the circumstances where the jurisdiction of classified hourly employees is covered from those that exist in the instant case. That is because, on October 16, 2016, all coal production at the Powhatan No. 6 mine ceased permanently, the mine was sealed, and the asserts were sold. None of these facts are disputed. According to the Company, this means that, at the present time, classified employees covered by the contract are not entitled to **any** work being performed at the mine site, **even if** it had been performed previously by them. When and if rough grading and reclamation work is done there, then those employees would be entitled to do that work; but that is not the case here.

As further certification for its position, the Company states that all of the Federal Court Decisions provided in this hearing were introduced in another arbitration proceeding presided over by arbitrator David Beckman on September 9, 2004. The Company asks this Arbitrator to take judicious note that, on October 25, 2004, arbitrator Beckman denied the grievances in their entirety. It maintains that the reasoning arbitrator Beckman used in reaching the conclusion that the grievances before him must be denied should be applied in the instant case; except for rough grading and reclamation which has not yet taken place at the Powhatan No. 6 mine.

The Company also provides a history of decisions made by arbitrator John West, including a copy of that made on October 14, 2011, to bolster its position. In 1996, arbitrator West ruled in the employer's favor in a closed mine case, the opposite way in 2001, and, on October 14, 2011, he ruled for the employer; relying on former Chief Umpire Phelan's authority to make both his 2001 and 2011 decisions.

Based upon the contract, the foregoing arguments, and the evidence it has supplied, the Company therefore asks that this grievance be deemed not arbitrable because Articles 1A(a), Article 1A(g), (1) and (2), and Article 1A(i) no longer have application to the permanently closed Powhatan No. 6. Mine.

**Union Position:**

The Union's position also is succinct. It relies on the contract to assert that nothing contained therein permits the Company to in any way alter the plain language it contains. There is still coal waste material from a Company owned, non-union sister mine being handled at the surface of the Powhatan No. 6 mine by the affected employees. It is not trucked in. The employees were retained by the Company to do this work, work that is of the type that they customarily performed when the underground mine was producing coal.[1] According to the Union, once the coal waste is on the Powhatan No. 6 mine property, work on the heavy equipment used to move the coal waste still belongs to the classified employees covered by the contract. One mine cannot run without the other.

Additionally, the Union notes the Mine Quarterly Production Information report to show that for production year 2017, the Powhatan No. 6 mine was classified as "Surface at Underground". To the Union, this means that, although coal was not being produced underground, that work on the surface of the mine still belongs to classified employees covered by the contract.

In its submission, the Union provided the text of a Letter Regarding Subcontracting, dated August 15, 2016, to Cecil E. Roberts, President, UMWA from Michael O. McKown, Chairman, BCOA Negotiating Committee. The text of that letter states:

---

[1] There is no dispute that the material handled is not fly ash or from a power plant.

> The UMWA has raised certain concerns about the use of subcontractors at signatory bituminous coal mines. The signatory Employers agree to meet and discuss with the UMWA the use of subcontractors at signatory mines during the term of the National Bituminous Coal Wage Agreement of 2016. Among other things, the parties will evaluate the impact of subcontracting on the work jurisdiction of mine workers covered by the NBCWA, review the current practices and extent of subcontracting at signatory operations and consider the effect of subcontracting on the safe and efficient operation of the mines.

According to the Union, the Company is attempting, through arbitration, to get something that is not theirs to take and that was not agreed to at the bargaining table.

The Union also maintains, because the Company did not raise a procedural challenge to the arbitrability of this case at either Step 2 or Step 3 of the grievance procedure, that its effort to do so belatedly at the Hearing should be rejected.

The Union provided several arbitration awards to support its contentions.

As remedy, the Union asks that this Arbitrator find that the grievance is arbitrable, that she hear the case on the merits, and that she retain jurisdiction when her award is issued.

## ANALYSIS

The basis for the Union's request for denial of the Company's challenge to the arbitrability of this case is that this threshold issue was not raised at either Step 2 or Step 3 of the grievance procedure. Article XXIII - SETTLEMENT OF DISPUTES, does not specify that arbitrators are empowered to make decisions on arbitrability. However, both parties agreed, at the outset of the Hearing, that this matter is properly before this Arbitrator to decide.

8

The question then becomes whether the Company's delay in raising a challenge to the substantive arbitrability of the merits constitutes a waiver of its right to do so at the arbitration proceeding? Courts generally hold that it does not. Depending upon the circumstances, arbitrators have ruled differently where questions of procedural arbitrability are concerned. It is reasonable to state that where substantive arbitrability is at stake, arbitrators generally consider this to be a valid claim, even when it is made for the first time at the arbitration hearing. In the instant case, it is clear from both the oral and written submissions made by the Union that it had notice, prior to the Hearing, that the Company intended to challenge the substantive arbitrability of the merits. Thus, the due process right of the Union to mount an affirmative defense has been protected and no bar exists to consideration of the Company's challenge.

The Company's interpretation of the arbitrability of this case is linear in nature. Relying on Article 1A (a) of the contract, the essence is that when coal production at a mine ceases permanently, then an "operation" no longer exists. Relying on court and arbitral case law, the Company says it is settled that, under these circumstances, classified employees covered by the contract are no longer entitled to any work even if they performed the work before. The Company does acknowledge that classified employees would be entitled to rough grading and reclamation work when/if it is ever performed at the Powhatan No. 6 mine.

The court decisions and arbitral awards submitted in this proceeding revealed that three things are of paramount importance in determining what the outcome shall be here: (1) the factual circumstances of this case; (2) the NBCWA; and (3) the court decisions and arbitral awards. With respect to the first of these, the following is a list of facts:

    a. The mine is permanently closed and the assets have been sold;

    b. The two Grievants are among the sixteen classified employees who continue to work at the mine;

    c. The repair and maintenance work the Grievants performed before the mine was sealed and perform now is "work of the type customarily related" to the production of coal;

    d. The case involves one company that is signatory to the NBCWA for the purposes of the Powhatan No. 6 mine and is also the owner of an adjacent, non-union mine;

    e. The coal land associated with the Powhatan No. 6 mine has not been abandoned nor have operations ceased on it since the underground mine stopped producing coal, the mine was sealed, and the assets were sold;

    f. The Company has not only continued to use the catch basin on this coal land, but also has enlarged it to accommodate coal waste from production at the adjacent mine that it owns; and

    g. The repair and maintenance work that was contracted out was not performed under warranty nor was equipment, adequate space, or manpower with the requisite skills to perform the work lacking.

Next comes consideration of the language contained in applicable provisions of the NBCWA and analysis thereof. Articles I and IA(a) have been cited by the Company as the foundation for its claim that this case is not arbitrable. The Company emphasized the facts that the Powhatan No. 6 mine is not longer producing coal, has been permanently sealed, and the assets have been sold to support its position. It follows, the Company said, since "operations" and "The production of coal" have ceased at the mine, then the work jurisdiction of classified employees, under Article IA(a) no longer exists. The one exception it grants is that if and when grading and reclamation of the site is initiated, then this work belongs to classified employees.

The Union has a different view. It asserted that the work performed by the Grievants is the same as that which they performed when the Powhatan No. 6 mine was operating, is still related to the production of coal, and is being done at the same location. According to the Union, this means that the disputed work is still within the jurisdiction of classified employees (the Grievants) under the NBCWA.

From a contractual standpoint, the Arbitrator finds that the Union's position that this grievance is arbitrable should be credited. The Company is still engaging in "operations" on the site of the Powhatan No. 6 mine. Article IA(a) refers to "The production of coal". The Company assumes that interpretation of this language must be restricted to 'production of coal' by the mine covered by the contract. However, nothing in the language contained in Article IA(a) restricts or eliminates coverage of classified employees who are performing work associated with 'the production of coal' by another Company owned mine (union or otherwise) when it is done on the property of a closed mine. The operation that has been and continues to be done there is maintenance (and now expansion) of a catch basin. This basin is essential to the removal of coal waste from production at the adjacent mine.

Support for this conclusion is provided by Article IA(f) of the contract. This language clearly and unambiguously states, in relevant part, that the Company, as signatory to the NBCWA, agreed that "the **operation of all the coal lands, coal producing and coal preparation facilities owned or held under lease by them, ...** " are covered. (emphasis added) Facts are that the Company has not divested itself of the coal lands associated with the Powhatan No. 6 mine and that it is conducting "operations" on that land associated with coal production at a property owned by it. Based on the contract, the Arbitrator must

therefore conclude that the work the Grievants were performing is related to "the production of coal" at an active "operation" at the mine and, thus, their work jurisdiction has not ceased to exist because the mine has been sealed.

This finding also comports with language contained in Article IA(f) regarding "work in or about the mine" and past practice. And, no showing was made, per Article IA(g) that the dozer in question was under manufacturer warranty or that equipment, employees with requisite skills, and space were unavailable so that contracting out was permitted. Based upon contract language, the Arbitrator therefore rules that the subject matter of this grievance is arbitrable.

The Arbitrator did consider the letter, dated August 15, 2016, to Union President Roberts from Chairman, BCOA Negotiating Committee McKnown. It is true that this document concerns "the impact of subcontracting on the work jurisdiction of mine workers". Note was made, however, note that the application is "**at** signatory mines"; not the subcontracting out of bargaining unit work. (emphasis added)

In addition to its interpretation of the contract language, the Company relied heavily upon numerous court decisions and arbitral awards to show that a distinction with a difference has been recognized repeatedly between the standing that classified bargaining unit employees and past practice have when a mine is producing coal and is an "operation" vis-a-vis when a mine has been permanently closed and no coal is being produced. The Arbitrator carefully read and considered all of these submissions, as well as the arbitral awards provided by the Union to the contrary. She also took judicious note that the Company stated that all of the information provided to her was also made available to arbitrator David Beckman when he wrote his 2004 "landmark decision" denying the

grievances submitted to him. (Grievance No. 1-04 and Grievance No. 2-04). It is neither necessary nor productive, therefore, for this Arbitrator to replicate arbitrator Beckman's excellent summary of the case law and arbitral findings.

Many things were gleaned from all of this information which shaped this Arbitrator's final decision on the matter of the arbitrability of the instant case. One is the determination of what is meant by the term "operations". According to dictionary definition and to arbitrator Beckman's finding, "operations" means an on-going activity involving active employees. The circumstances of this case fit this definition. The Company was and is conducting "operations" related to 'The production of coal" on the lands it owns at the Powhatan No. 6 mine. That work was and is being performed by active employees. Thus, and in view of Article IA(f) of the NBCWA, this would mean that this grievance is arbitrable.

Another approach could be that, once the mine was closed permanently, the only express prohibition protecting the work of classified employees is contained in Article IA(g), and this has not yet happened. This could mean, under court and arbitral case law, that the arbitrability of this case should be denied. As arbitrator Beckman recognized, this interpretation can be limited by the term 'operations' contained in Article I of the NBCWA. Facts here are that the Company has not ceased 'operations' on the coal lands associated with the Powhatan No. 6 mine and, in fact, is operating on that land to support coal production at an adjacent mine which the Company owns. As noted previously, under the terms of Article IA(f), this Arbitrator has determined that this is not protection against a determination that this case is arbitrable.

However, the Arbitrator noted the determination in *Beth Energy Mines, Inc. v. UMWA*, 30-5741, United States District Court for the Eastern District of Kentucky, Case No. 87-38 (1988). In that case, Magistrate Hood held that coal lands are not included within the meaning of 'operations'. This Arbitrator holds that the circumstances of that case are distinguishable with a difference from the instant case. The Company here owns both properties in question and is 'operating' the coals lands and is utilizing classified employees at the Powhatan No. 6 mine to support "the production of coal" and its "operations" at an adjacent mine. Thus, she reiterates her determination, based upon Article IA(a) and (f) that this grievance is arbitrable.

Nevertheless, a great deal has been written about the eradication of work jurisdiction when a mine ceases to actively produce coal; i.e., to be an "operation". Although it might appear that this is a well settled issue, a reading of the cases caused this Arbitrator to conclude that there are nuances that must be considered on a case-by-case basis before a blanket prescription is applied. For example, a mine site, not just the mine itself can clearly come into play as it does in the instant case. Additionally, it is not crystal clear whether the definition of an "operation" is limited to an active coal mine. In *Eastern Associated Coal Co. and UMWA Local 9177, District* 17, arbitrator John Vierthaler defined the plain meaning of "coal mining operations" to include "coal [that] is being mined **or** processed". (emphasis added) Part of the process, as in the instant case, is disposal of coal waste which was actively being done through an operation located on the site of the Powhatan No. 6 mine. No showing was made that the adjacent mine owned by the Company could produce coal absent the coal waste disposal catch basin located on this property. And there is no contract language the precludes the Grievants from having

jurisdiction over the work in question simply because the coal waste now comes from an operating, Company owned, adjacent mine.

Other decisions cited by the Company, like *Amax Coal Company and UMWA*, 11-1015, Case No. 11-84-55A, support its contention that once the mine was permanently closed and dismantled, that there is no work that classified employees do that in any "way aids the production, preparation, processing, cleaning or transportation of coal at the mine". Additionally, in cases like *Western Slope Carbon and UMWA*, 15-6417, the arbitrator held that "the contract does not provide protections against loss of work opportunity" when there is a permanent curtailment of mining operations.

All of these cases might have been persuasive, but for the facts of this particular case. There are differences here that this Arbitrator holds to be distinguishable from all of the above. The Company here has continued to actively use (operate) coal land and classified employees associated with the Powhatan No. 6 mine to support coal production at its adjacent mine. Granted, this work does not support coal production at the subject mine, but it does support and is essential to coal production at and the operation of the adjacent mine which is also owned by the Company. In accordance with Article IA(a) and (f), and otherwise, this means that cessation of coal production at the mine does not necessarily mean that work jurisdiction of classified employees ceases. The intent of the Company is evidenced by its action in retaining sixteen classified employees, including the two Grievants, to perform "work of the type customarily related " to the work that they performed when the Powhatan No. 6 mine, itself, was producing coal. Although the mine is closed, the Company has continued to actively operate (and even expand) the coal waste catch basin on the property as an integral part of coal production at its adjacent plant.

15

Therefore, the practices which existed still have a binding effect and the contract language is enforceable.

Citing arbitrator Phelan, this was recognized in arbitrator John West's award, dated October 14, 2011.[2] Phelan wrote:

> The fact that production of coal at the mine [has ceased] does not, in my view, <u>necessarily</u> mean that the work jurisdiction of the classified Employees in the bargaining unit has also ceased. That will depend, in large part, upon the circumstances in each individual case. Consideration would have to be given to the nature and purpose of the work being performed, how closely associated it was to production activities, whether or not the work was required to be done in conjunction with or is a result of production activities, whether or not the mine was permanently closed, and other similar considerations. It does mean, however, that the situation is not the normal one, and care must be taken in applying the normal principles of contract interpretation and application. For example, past practice and custom which reflect agreed upon ways of doing things when the mine is operating may take on an entirely different character at a mine that is closed, and may not necessarily reflect the agreement of the parties under the different circumstances. ... The discontinuance of production at the mine sometimes changes the nature of the work itself, and therefore such situations generally bear careful examination. (Emphasis in original)

It should be noted that only one of the factors that arbitrator Phelan identified as critical is "whether or not the mine was permanently closed". This Arbitrator respects the decisions made by courts and other arbitrators on this complex subject. As stated in this Analysis, under the circumstances of this particular case, a number of circumstances come into play which have caused her to conclude that this case is arbitrable and that the NBCWA is enforceable.

---

[2] The cover page of this award was not included with the evidence so the parties to this case could not be identified.

## **AWARD**

The Arbitrator has determined that the grievance submitted by the Union is arbitrable.

The Arbitrator retains jurisdiction, as requested by the Union, and uncontested by by the Company, over a hearing on the merits of this case.

Date: October 21, 2017   _____
                                         Mollie H. Bowers, Arbitrator

17