**IN THE MATTER OF THE ARBITRATION BETWEEN:**

**The Ohio Valley Coal Company Powhatan
No 6 Mine**

-and-

**United Mine Workers of America, District
31, Local Union 1810**

**ARB Case#:** 16-31-17-021

**Grievance No.** 17-31-04

**Grievants:** Tom Holland &
Mike Horstman

**ARBITRATOR:**                                     Mollie H. Bowers

**APPEARANCES:**

    **For the Company:**                    Kenneth Eller, Consultant

    **For the Union:**                        Rick Altman, UMWA, Sub 6 Office

       These proceeding were invoked pursuant to an award issued by this Arbitrator, on October 21, 2017, in which she found that Grievance No. 17-31-04 submitted by the United Mine Workers of America, District 31, Local Union 1810 (the Union) to The Ohio Valley Coal Company Powhatan No. 6 (the Company) was arbitrable. The hearing for the purpose of determining remedy was held on January 24, 2018, at the Springhill Suites in Wheeling, West Virginia. Both parties were represented. They had a full and fair opportunity to present their case and to cross-examine that presented by the opposing party.

       At the outset of the proceeding on January 24, the Company made it known that it had appealed the Arbitrator's October 21, 2017 award to the United States District Court for the Northern District of West Virginia Clarksburg Division for the purpose of having it vacated. The hearing went forward. There was controversy over whether or not the Arbitrator should consider additional information that was not provided by the Company at the hearing held on September 20, 2017, as well as over whether or not a remedy requested by the Union should be awarded to the Grievants.

       A transcript was made of the proceedings. However, given the pendency of the court determination and at the suggestion of a Company representative, it was agreed, by both parties, and by the Arbitrator, that the parties would provide briefs, mailed by the close of business (5:00 p.m.) on February 2, 2018. It was further agreed by all concerned that these briefs would be prepared sans any party and/or the Arbitrator having use of the transcript made at the hearing on January 24, 2018. This means that the Arbitrator's notes constitute the official record of testimony and evidence provided at this hearing. Since the

EXHIBIT

2

matter includes what transpired at the hearing held on September 20, 2017, that evidence is also considered to be part of this record.   The Union's brief was received by the Arbitrator on January 31, 2018.   The Company's brief was received by the Arbitrator on February 6, 2018.

## ISSUE

The parties disagree about the statement of the issue.  The Union contends that the only issue in dispute is the remedy owed to the Grievants.

The Company asserts that the issues are:

> Is the Arbitrator's Decision, dated October 21, 2017, final and binding under ARB 78-24, since it was made without benefit of some important and relevant facts; and/or was based upon an obvious and substantial error of fact or law, predicated on the fact that no supporting evidence was on the record in the September 20, 2017 hearing?  If Yes,

> Did the Employer ("TVOCC") violate any of the terms of the NBCWA of the 2016 as Modified by the MOU ("Agreement") when it sent a Caterpillar D-6 Tractor to an outside Contractor, who shares jurisdiction, for certain repairs during a period when the Grievants were not available?

After full and thorough consideration of the record, the Arbitrator decided that the Company's first statement of the issue should be adopted.  The Union strongly opposed the this statement, claiming that the Company was seeking a "do-over" and a second "bite at the apple".  The Arbitrator agrees, but for the exigent circumstances particular to the instant case.

When the proceedings began at the hearing on September 20, 2017, the Company requested that the proceedings be bifurcated because it believed that a decision on the arbitrability of the case would be dispositive of the matter in its entirety.  The Company presented one large and one smaller package of **evidence** that was entered into the **record**.  The Union also presented a package of **evidence** that was entered into the record.

2

Based upon the documents contained in this **evidence** and on the collective bargaining Agreement which was also entered into **evidence**, time was afforded to both parties to consider whether they believed this was sufficient **evidence** and/or wanted to present testimony for the record.

At the outset of the hearing held on January 24, 2018, the Company not only notified the Arbitrator that it had appealed her decision on arbitrability to the court for the purposes of having it vacated, but also argued that a primary basis for this appeal was that no evidence or testimony was entered into the record upon which the Arbitrator could have made a decision that the grievance was arbitrable. (CX-2, Tab D)   As indicated previously and as is a fact of record, **evidence** was provided to the Arbitrator.

The Company also intimated that it was inappropriately foreclosed from presenting testimony that it could have, at the hearing held on September 20, 2017, and that this, too, was a basis upon which it claimed to the court that the Arbitrator's decision on arbitrability should be vacated.   What transpired at the conclusion of that hearing is recorded in the transcript of that hearing.   The Arbitrator specifically stated the following:

> I'm not trying to take anyone's opportunity away to have their say or anything else, but we have a disagreement over whether or not the contract applies.  And until that's decided nothing else matters.  And I'm not -- gentlemen, I'm not trying to say your concern doesn't matter, but I can't go any father until I resolve that issue. (TR, p. 44)

The Company's representative, Mr. Eller, then responded, "We agree and if you find this arbitrable, then we've got to argue IA(g)(2), whether or not one of the exceptions apply". Mr. Ellen then asked if the Arbitrator should make this decision "without evidence"? (TR, p. 44)   He wanted to authenticate the **evidence** that the Company had provided with witnesses.   It is a fact that Mr. Altman, the Union's representative, agreed that he had seen

3

the Company's evidence and that he had no objection to it and, thus, authentication was not necessary. (TR, pp. 45-46)   The Arbitrator gave both parties time, off the record, to consider whether they the record that they had made was sufficient for her to make a decision on the question of arbitrability.

When the parties returned, Mr. Altman stated:

> Personally, I don't think you need any witnesses.  I think you
> [the Arbitrator] have the material to decide whether or not
> this is arbitrable, I guess, or not. (TR, p. 48)

Mr. Altman asked that the Arbitrator retain jurisdiction; regardless of the outcome. (TR, p. 48) Mr. Eller then asked that Union Exhibit 1 be marked as **evidence** even though it was also identified as Company Exhibit F.  This was done.  Mr. Eller also asked if a document could be introduced into **evidence** as Employer Exhibit 1.  It was accepted into evidenced. Thereafter, neither party had any objection to the proceedings being closed and for the Arbitrator to determine the question of arbitrability based upon the **evidence** provided in this proceeding before she considered the merits of the case and any remedy that might accrue as a result.  Apparently, the Company believed then that the numerous cases it provided as **evidence** would suffice to convince her that she must find that this grievance is not arbitrable.  Contrary to the Company's expectation and based upon the record of **evidence** provided by both parties, the Arbitrator determined that this grievance is arbitrable.

It was evident, given the information that the Company provided, **for the first time,** at the hearing on January 24, 2018, that its appeal to vacate of the Arbitrator's award of October 21, 2017, was likely to be granted by the court.  In the interests of fairness and of due process to both parties and  to the Grievants, the Arbitrator has decided to consider all

of the information provided for or incorporated into the record at the January 24 hearing. In so doing, the Arbitrator takes judicious note that all of the documentation and testimony presented by the Company at the hearing on January 24, was readily available to it when the hearing was held on September 20, 2017; but was not presented at the Company's election. She is well aware that arbitrators, under appropriate circumstances, can consider after acquired evidence and that the court did not look kindly on an arbitrator who failed to do so. However, that is not the circumstance here. No showing was made by the Company that all of the documents and testimony provided by it at this hearing were not available to it and could have been presented at the September 20, 2017 hearing, **if** the Company so chose. It did not and was not precluded from so doing. As a consequence, the Arbitrator made her determination on arbitrability based upon the **evidence** she had at the time; to include the collective bargaining Agreement.

The Company's assertion that it did not know, on September 20, 2017, whether the Arbitrator would grant bifurcation is not an affirmative defense. To reiterate, the Company's representatives knew, before the hearing was closed, had time to consider whether any additional documentation and/or testimony was necessary, and agreed that nothing else was necessary for the Arbitrator to make a decision on the arbitrability of this case. If the court vacates the Arbitrator's award, based on the inadequate information she had as a result of the hearing held on September 20, 2017, and briefs, then this would mean that neither the question of arbitrability nor the Grievants' complaint on the merits would ever have been given full and fair consideration which is the Arbitrator's responsibility. This is why the Arbitrator therefore chose to adopt the Company's first statement of the issue for the purpose of determination here.

The Arbitrator did not adopt the Company's second statement of the issue because it assumes facts not in evidence at the outset of the January 24, 2018 hearing.  Based upon a full and fair consideration of the record, the Arbitrator has determined, as she is entitled to do under arbitral precedent and practice, that the second statement shall be:

> Did the Company (TVOCC) violate any terms of the NBCWA of 2016, or any modification thereof, when it sent Dozer 6 to an outside contractor on March 9, 2017?  If so, what shall the remedy be?

## DISCUSSION AND ANALYSIS

One basis upon which the Company challenged the Arbitrator's October 21, 2017 award is that she erred in determining "ownership".  The Arbitrator agrees because it was only at the hearing, held on January 24, 2017, that the Company provided evidence, other than a "sister" mine was using the slurry impoundment at the Powhatan No. 6 mine.  This could be interpreted as a double-breasted situation.  The reality is that Murray Energy Corporation is an umbrella corporation which has subsidiaries.  One of those subsidiaries is The Ohio Valley Coal Company, party to this dispute and a signatory to the National Bituminous Coal Wage Agreement of 2016 (NBCWA).  The other is the American Energy Corporation (AEC) which owns the "sister' mine, called Century Mine, and is non-union.  Note must be made that nothing in this or in the previous decision by this Arbitrator is imagined or intends to extend any jurisdiction by the Union to the Century mine.

Another item the Company brought forth, for the first time, at the hearing on January 24, 2018, was a Memorandum of Understanding (MOU) between the Company and the Union which ends on December 21, 2021 (The beginning date was not legible from the document provided).  The Company made much of claiming that the language contained

6

therein supported its case.   Careful review of this document revealed that only item 1.

could pertain to the instant case.   That language states as follows:

> 1. The descriptions of coal properties, coal lands, coal reserves, coal mining operations and facilities of the Employer as set forth in Article IA(f), Article I Attachment 1, and Exhibit A of the 2012 Coal Wage Agreement between The United Mine Workers of America and The Ohio Valley Coal Company and The Ohio Valley Transloading Company (hereinafter ""2012 Employer Coal Wage Agreement") shall remain in effect.  (CX - Tab A)

As indicated in the Arbitrator's award of October 21, 2017, Article IA(f) was significant in

her determination that this dispute is arbitrable.   At the hearing on January 24th, the

Company expressed surprise that the Arbitrator had considered Article IA(f) because it was

not mentioned in the grievance.   The Arbitrator's response is that the collective bargaining

Agreement was submitted into **evidence** and, thus, it was incumbent upon her to

determine that any award she issued was based upon and in compliance with that

Agreement.

Furthermore, the relevant language contract language in Article AI(f) states that

"the Employers **agree that this Agreement covers the operation of all the coal lands,**

**coal producing and coal preparation facilities owned or held under lease by them,** . . .

[which are] **put into production or use."** (emphasis added)  No finding is made that the

MOU either modifies the Agreement or should alter the Arbitrator's award of October 21st

regarding arbitrability.   Indeed, the language contained in the MOU strengthens the

Arbitrator's interpretation of Article IA(f) by clearly and unambiguously stating that the

**Agreement** covers all coal lands, as well as "coal producing and coal preparation facilities".

What the language does not say is that under any and every circumstance, when "The

production of coal" ceases and a mine is permanently closed, classified employees

automatically lose jurisdiction over the type of work that they customarily performed when coal was being produced regardless of on-going employer activities on coal lands belonging to that mine.

Note must also be taken that the language in Article IA(f) specifically and unambiguously addresses **"production or use"** meaning one can occur without, or as an alternative to, the other. (emphasis added)  In the instant case, production at the Powhatan No. 6 mine has ceased, but the significant fact here is that the coal lands have not been divested or abandoned, but rather are actively being **used** to impound slurry from AEC.

For the first time at the January 24th hearing, the Company presented the Slurry Disposal Agreement (SDA) between the Company and the AEC, signed on August 8, 2002. That document states, in pertinent part, as follows:

> Whereas, AEC is in need of a facility in which to dispose of fine coal and refuse in slurry form (the "Slurry Material") resulting from operation of AEC's preparation plant . . .
>
> . . .
>
> The quantity of Slurry Material to be accepted by OVCC [the Company] under this Agreement shall be, at the discretion of AEC, all Slurry Material produced by AEC during the term of this Agreement, and resulting from the **operation** of AEC's preparation plant and associated facilities. (emphasis added)
>
> . . .
>
> Title and risk of loss shall pass from AEC to OVCC as the Slurry Material is deposited by AEC into OVCC's Facilities. . . .
> (CX-2, Tab H)

Roy A. Heidelbach, Murray Energy Corporation Assistant Vice President of Operations testified at the January 24, 2018 hearing regarding the SDA; among other things.  With respect to the SDA, he said that a decision was made a long time ago to use the

impoundment at the Powhatan No. 6 mine to contain the slurry from coal production at AEC for reasons of economy and efficiency.  The Company asserted that AEC could readily find means of its own to manage the slurry, but no proof was provided.

It is important that "title and risk of loss" accrue to the Company as soon as the slurry from AEC is deposited on the coal lands and in the impoundment owned and operated by the Company.  Equally important is the fact that the SDA provides for the Company to be compensated by AEC for **use** of the slurry impoundment located on the **coal lands** at the Powhatan No. 6 mine.  Based upon the many cases provided by the Company, this is not the normal situation when the "laws of the industry" are applied, *per se*, to find that when production at a mine ceases, the work jurisdiction of bargaining unit employees also ceases.

Nevertheless, the Company insists that the "laws of the industry" have precedential value, are essentially incorporated into the collective bargaining Agreement and, thus, must be adhered to by this Arbitrator in making her decision.  That is, many arbitrators have ruled that once a mine is permanently closed, this means that bargaining unit employees have no standing to claim jurisdiction over the type of work that they previously performed, unless reclamation work exists.  This interpretation rests heavily on the language contained in Article IA(a) and, in particular,  on the reasoning that once "**The production of** coal" ceases permanently, the predicate no longer exists upon which the work jurisdiction of classified employees, by practice or otherwise, depends.  Some examples contained in the case law include, but are not limited to: when all classified employees have been laid off; when an outside contractor removes equipment purchased as a result of the closing; when there is a significant change in circumstances; salvage of

9

mine equipment by supervisory employees when a buyer could not be found; transfer of existing equipment to a mine that was still producing coal; and so on.  There is no dispute that the Powhatan No. 6 mine was permanently closed, in October of 2016, and that reclamation work had not begun at the time the grievance was filed, nor had it  begun at the time of this hearing.

This Arbitrator has considered all of this evidence and acknowledges that it can be very persuasive.  She also noted that Article IA is titled "Scope and Coverage" and that Section (a) "Work Jurisdiction" is only one section of nine (9) in that Article.  This does not necessarily or always mean that the language "The production of coal" in IA(a) is controlling throughout the remainder of that article as evidenced by that contained in Article IA(f) and/or immune to impact by other intervening factors.  As she did in her award of October 21, 2017, the Arbitrator again notes the advice of respected former Chief Umpire, arbitrator Thomas Phelan when he held that the circumstances of each case must be considered in determining the appropriate outcome.    To reiterate, Phelan stated that:

> The fact that production of coal at the mine [has ceased] does not, in my view, **necessarily** mean that the work jurisdiction of the classified Employees in the bargaining unit has ceased.  That will depend, in large part, upon the circumstances in each individual case.  Consideration would have to be given to the nature and purpose of the work being performed, how closely associated it was to production activities, whether or not the work was required to be done in conjunction with or is a result of production activities, whether or not the mine was permanently closed, and other similar considerations.  It does mean, however, that the situation is not  the normal one and care must be taken in applying the normal principles of contract interpretation and application.  For example, past practice and custom which reflect agreed upon ways of doing things when the mine is operating may take on an entirely different character at a mine that is closed, and may not necessarily reflect the agreement of the parties under the different circumstances. . . . The discontinuance of production at the mine sometimes changes the nature of the work itself, and therefore such situations generally bear careful examination.

(emphasis added)

Based upon the facts and circumstances of this particular case, the Arbitrator once again finds that the grievance filed on March 9, 2017 is arbitrable.  As she moves forward to consider whether or not the Grievants are entitled to any remedy, the Arbitrator will be looking at the facts and circumstances of this particular case to answer that question.

This is not a simple case where the facts are that the mine was permanently closed, all assets had been sold, classified employees had all been laid off,  and the coal lands were no longer in use or had been sold when the grievance was filed.  For the purposes of clarity and efficiency, it is useful to summarize undisputed facts.  The Powhatan No. 6 mine was permanently closed and all coal production ceased there on October 16, 2016.  When that occurred, the Grievants were not laid off, but rather continued doing the repair and maintenance work of the type that they normally performed while the mine was producing coal except as directed otherwise by Supervisor Dan V.[1]  They were not laid off until September of 2017; after this grievance was filed on March 15, 2017.  The machinery that the Grievants worked on at the mine, both before and after it was closed, was used, *inter alia*, to support the slurry impoundment utilized by AEC under the SDA on the mine's coal lands.  No showing was made that the Grievant's lacked the skills and ability (in fact to the contrary) to perform the work in question and/or that facilities were not available at the mine for the Grievant's to perform the work in question.  The record does show that, at the time in question, both Grievants were working forty (40) hours a week, with a very small amount of overtime.  The Company agreed that Management has the authority to grant, and even to mandate, overtime.  Management also has the right to assign work and to direct the

---

[1] The spelling of Supervisor V's name was not provided for the record.

work force.  Dozer 6 had been sitting idle and in need of repair for some time when the Company subcontracted the work to Wheeling Diesel Shop on March 9, 2017.

Mike Horstman, a Diesel Mechanic, is one of the Grievants.  He has worked for the Company for fifteen (15) years.  He testified that although Caterpillar had a presence on the mine property when he was hired, that ended thereafter and that subcontractors were rarely there except on the few occasions when warranty work needed to be done.  He said that he has worked on Dozer 6 all of the time and never knew of any work on this Dozer being contracted out.  He said that repair and maintenance of this Dozer was not a one-man job because the parts were both heavy and cumbersome.  According to Horstman, there used to be four (4) Mechanics, but it was down to two (2) while the mine was still producing coal.  He had worked in tandem with the other Grievant, Tom Holland, on Dozer 6 and on all the equipment for years.  He reiterated that, "Every time it was repaired, we did it [worked on Dozer 6]" "We never ever sent anything out".  While the mine was still operating, Horstman said that the Company got all the parts for Dozer 6 from Wheeling Diesel, but they [the Grievants] had to redo it because they "didn't do it right".

Also while the mine was still operating, Horstman testified that his Supervisor, Dan V., told him to only change light bulbs, hoses, wipers, etc., split him up from working with Grievant Holland saying, "You guys don't work on that stuff no more." The Grievant interpreted this to mean that the equipment that he and Grievant Holland had worked on customarily and of the type they had performed throughout their extensive careers with the Company was not longer available to them.  Horstman said that Grievant Holland and he asked to work on Dozer 6 and that "we begged for overtime" but, one day we came in and Dozer 6 was gone.  Horstman further stated that Supervisor V. told him that he could

not grant overtime, which he asked for every day, because he, Supervisor V., would be fired if he did so.   At Step 3, Horstman said all that Management referred to was "1a work".

Grievant Holland's testimony corroborated that of Grievant Horstman on all accounts. He said that when Supervisor V. told him to work on horns, hoses, and wipers, that the "bigger work" was going to be contracted out. He also testified that Wheeling Diesel tries "to do repair and maintenance work at No. 6 mine", they say it is warranty work. and that Caterpillar had been there "maybe four or five times" in ten years.  He acknowledged that Caterpillar could have been there when it was not his shift.  This acknowledgment was given no weight because, as the record will show, Caterpillar has not been the subcontractor of choice at the Company for years.  Holland also stated that he asked for and would have worked overtime every day if he had been permitted to do so.

One of the Grievants testified that he filed a grievance every time any subcontracting in contravention of the Agreement occurred.   No evidence of any such grievances was presented for the record and, thus, this contention was given no weight.

The Arbitrator drew some conclusions based upon the testimony provided by the Grievants.  The first is that even before the Powhatan No. 6 mine was permanently closed, Management started to deliberately erode the type of work normally being performed by classified employees, Mechanics specifically, under the Agreement.  This is indication that although Management has the right to direct the work force and to assign work, this right was exercised arbitrarily and capriciously with the apparent intent to eviscerate the work of the classified Mechanics.  In reaching this conclusion, the Arbitrator took judicious note that although Supervisor V. was mentioned in the testimony of the Grievants, he was not presented as a witness or as a rebuttal witness by the Company in this proceeding.  No

reason was given by the Company why this could not be done; nor was a request made that the record be kept open until his testimony could be produced. Therefore, the Arbitrator properly drew a negative inference that, had Supervisor V. been presented as a witness, that his testimony would not have been beneficial to the Company's position in this case.

Tim Baum, Supervisor Employee Relations, was the first witness that the Company presented to support its position that this case is not arbitrable and that the Grievants are not entitled to any remedy. He introduced the application of past practice into the instant dispute. According to Baum, even if a past practice had existed that the Grievants performed all of the repair and maintenance work at the Powhatan No. 6 mine, including on Dozer 6, the predicate for this practice, production of coal, no longer existed and, thus, neither did the past practice.[2]

The Company also had another theory of the case that was brought forth partially through Baum's testimony. That is, that the Grievants did not customarily do all the repair and maintenance work, even when the mine was operating, because the practice was mixed. As Baum explained, this means that the repair and maintenance work was not exclusive to classified employees, but rather was mixed with some work being done by subcontractors. According to Baum, he did not mention this at previous steps in the grievance procedure or at the hearing held on September 20, 2017 because he did not have the information at the time to support this contention -- but now, he said, the Company did. Baum testified that subcontractors have always been used at   prep.   plants   and   after talking with Justin Nash, he concluded that this was the customary and mixed practice at the Powhatan No. 6 mine.

_____

[2] Baum presented the same argument where mixed practices were concerned.

On cross-examination, Baum was asked about overtime.  He said that he was not aware that the Grievants had been denied overtime either before the mine closed or after. He agreed that Management can require mandatory overtime if there is a reasonable business need.

In support of Baum's testimony regarding mixed practice, the Company again referred to that provided by Heidelbach.  He stated that he had been Superintendent of the Powhatan No. 6 mine from 1996-2003 or 2004.  He testified that sometimes "hourly guys" were not available so contractors were brought in and that contractors had been used for a variety of purposes many times at the mine.  According to Heidelbach, "Availability is key". No weight was given to this aspect of Heidelbach's testimony because he had no contemporaneous knowledge of the practice, mixed or otherwise, at the Powhatan No. 6 mine.  Note was also made that if "Availability is key", then the Arbitrator is at a loss to understand why Supervisor V. did not utilize the time the Grievants had available to work on Dozer 6, work of this type that they had performed for years, instead of requiring them to changes hoses, wipers, horns, etc. and severely restricting their overtime while they would willingly have worked?

With late notice, the Company presented Justin Nash, Manager of the Wheeling Diesel Shop, to bolster testimony provided by Baum and Heidelbach.  That is, a mixed practice had existed at the Powhatan No. 6 mine and, thus, the Grievants did not have exclusive jurisdiction to perform the work on Dozer 6.  According to Nash, the Wheeling Diesel Shop took over at least whatever warranty work Caterpillar once performed when it had a presence on the property.  The Wheeling Diesel Shop is not located on the property of the Powhatan No. 6 mine.  Nash testified that he did not recall that all the work he did at

15

the mine was under warranty -- he said he did "whatever job the Superintendent asked them to do". This occurred a "handful" of time a year. According to Nash, he has repaired equipment from the Powhatan No. 6 mine in the shop and he also went to the mine and usually had to work outside -- "a couple of pieces a year". Nash knew both Horstman and Holland and said that he had worked along side of them doing repair and maintenance work. This testimony could not be given any weight, however. Neither Nash nor the Company provided even a single invoice to substantiate Nash's claims about any of the work he said the Wheeling Diesel Shop had done, whether warranty or repair and maintenance, at any time, for/at the Powhatan No. 6 mine. The "laws of the industry" clearly show that this type of evidence can be critical in determining the outcome of cases like this.

Based upon the foregoing, it should be apparent that this Arbitrator was correct in heeding the advice of respected former Chief Umpire, arbitrator Thomas Phelan that each case should be considered on its merits. Accordingly, she did not consider that the Union and the Grievants automatically had no claim to the work grieved simply because coal production at the Powhatan No. 6 mine had ceased permanently. Indeed, the record of the hearing held on January 24, 2018, indicates, through the uncontroverted testimony of the Grievants, that Management sought, even prior to the closing of the mine, to constrain the type of work, repair and maintenance, that the Grievants had normally and customarily performed on machinery at the Powhatan No. 6 mine; to include Dozer 6. The Company also failed to demonstrate that a mixed practice regarding maintenance and repair work existed either prior to or after coal production at the mine ceased. The Company provided

no invoices to show that such work had been done by the Wheeling Diesel Shop, or by any other contractor.

No showing was made by the Company that the Grievants could not perform the work in question or that facilities were not available on the property to perform this work. As noted previously, the Grievants were working forty (40) hours per week at the time, on menial tasks, with only crumbs of overtime being granted by and before the grievance was filed. They were willing to work. The Arbitrator recognizes that it is Managements right to assign work, to direct the work force, and to require overtime. However, to have standing, these rights must not be exercised in the arbitrary and capricious manner that this record demonstrates. As Phelan recognized, consideration must be given when "the situation is not the normal one and care must be taken in applying the normal principles of contract interpretation and application". Given the facts, and the credible evidence and testimony provided in this particular case, the Arbitrator has determined, once again, that the Company's decision to subcontract work on Dozer 6, on March 9, 2017 is not only arbitrable, but also that the Grievants are entitled to a remedy.

At the hearing held on January 24, 2018 and in its post-hearing brief, the Company disagreed with the Arbitrator that it had agreed previously that if the grievance was deemed to be arbitrable, then the Company would grant a remedy. While the **evidence** from the hearing held on September 20, 2017, indicates otherwise, that matter is now moot. For the second time, the Arbitrator has deemed this dispute to be arbitrable. However, that does not mean that the Arbitrator has determined that the remedy requested by the Union should be awarded. .

Based upon correspondence in **evidence** to Union Advocate, Rick Altman, from Cory R. Barack, Esq., attorney for the Company, it was established that "Two (2) non-bargaining unit members performed the work". (UX-Emails)  Correspondence in **evidence** to Altman from Barack, dated November 28, 2017, further established that "No proposals or invoices could be located, however there were ninety-six (96) hours of labor performed on the D6 bulldozer, relative to grievance 17-31-04". (UX - Emails)  The Union used this information to claim that the appropriate remedy is for each of the Grievants to receive ninety-six (96) hours of work at time and one half their regular rate of pay.

The Arbitrator determined that this remedy is not supported by the evidence provided.  The total number of hours spent repairing Dozer 6 was ninety-six (96) and was accomplished by two (2) non-bargaining unit employees.  The credible testimony provided by the Grievants is that it would require both of them to do the repair work in question. Since they are very experienced Mechanics and have worked on Dozer 6 for years, the Arbitrator found no reason why they could not have completed the repairs within the same amount of time as that expended by the non-bargaining unit personnel.  She rules, therefore, that a total of ninety-six (96) hours of work shall be awarded in an equal amount (forty-eight (48) hours) to each Grievant.

Then comes the question of the rate of pay at which this time shall be compensated. The record shows that the Grievants, at the time in question, were working forty (40) hours a week with a miniscule amount of overtime.  Under other circumstances, this could mean that they were not 'available' to do the work and, thus, the Company exercised its right to contract out the work.  Cases contained in the "laws of the industry" support that

18

conclusion.  However, the Arbitrator again remembered Phelan's expert guidance that each case should be considered on its merits.

The Grievants provided credible and unrebutted testimony that Supervisor V., even before the Powhatan No. 6 mine ceased producing coal, assigned them to work on menial tasks, split Grievants Horstman and Holland up so they could not do the type of work that they had customarily done on machinery like Dozer 6, severely restricted their overtime, and indicated that work on the "big jobs" would be contracted out.  The Company's **evidence**, contained in J confirms that the Grievants were working forty (40) hours per week with very minimal overtime at the time this grievance was filed.  No evidence or testimony was provided for the record that, but for Supervisor V.'s arbitrary and capricious assignment of work to the Grievants, that they would not have had the time and/or the facilities on the property to repair Dozer 6 during normal working hours.  But this is not what happened.  The Grievants worked their regular hours, performing menial tasks, as directed.  Under the circumstances of this case and based upon the **record** it must be concluded, therefore, that the only way  the Grievants could have performed the type of work that they had customarily performed on machinery, including Dozer 6, would have been on overtime -- which they were readily available and continuously expressed that they were willing to work.  Based upon the foregoing determinations by the Arbitrator, it follows that her award with respect to the remedy shall be that the Grievants each be compensated for forty-eight (48) hours of work at time and one half for overtime.

## <u>AWARD</u>

Once again, this Arbitrator rules that this grievance is deemed to be arbitrable.

As a result of this ruling, the Arbitrator also rules that the Grievants are entitled to a remedy.  That remedy shall be that each of the Grievants shall receive forty-eight (48) hours of overtime pay at one and one half times the rate of pay they were receiving when the grievance was filed on March 15, 2017.

The Arbitrator shall retain jurisdiction over this dispute until she is notified, in writing, by both parties that this award has been complied with fully.

Date: February 20, 2018  _____
                                        Mollie H. Bowers, Arbitrator