United Mine Workers of America
Local Union 1810
Vs.
Murray American Energy Inc.
Ohio Valley Coal Co.
Arbitrator Molly Bowers
September 20, 2017
Arbitration No. 16-31-17-021
Grievance No. 17-31-04
Contracting Out and Past Practice


# Procedural Argument


## The Issue


Did management violate the terms and conditions of the 2016 N.B.C.W.A. when management decided to contract out bargaining unit work?

Arbitrator Bowers, the issues before you are simple:

(1) Have management show us where the framers of the agreement have negotiated away the contractual rights and work jurisdiction of the membership.

(2) Arbitrator Bowers, please have management quote from the wage agreement Article XXI or any other Article, where the framers have said if this happens then Article such and such does not apply. Arbitrators Bowers, it is not in there.

(3) Arbitrator Bowers, on page 281 of the 2016 wage agreement in a letter to President Roberts. Written by Michael O. McKowan

**Article XXIX – Ratification and Termination of This Agreement**

**Letter Regarding Subcontracting**

Bituminous Coal Operators' Association, Inc.
1776 I Street, NW - Suite 245
Washington, D.C. 20006-3703

August 15, 2016

Exhibit I

Cecil E. Roberts
President
United Mine Workers of America
18354 Quantico Gateway Drive
Suite 200
Triangle, VA 22172

Dear Mr. Roberts:

The UMWA has raised certain concerns about the use of subcontractors at signatory
bituminous coal mines. The signatory Employers agree to meet and
discuss with the UMWA the use of subcontractors at signatory mines during the term
of the National Bituminous Coal Wage Agreement of 2016. Among other
things, the parties will evaluate the impact of subcontracting on the work jurisdiction
of mine workers covered by the NBCWA, review the current practices and
extent of subcontracting at signatory operations and consider the effect of
subcontracting on the safe and efficient operation of the mines.

Sincerely,


Michael O. McKown
Chairman, BCOA Negotiating Committee


Arbitrator Bowers, managements own Chairman, BCOA Negotiating Committee
drafted that letter to President Roberts. Has management presented any such letter
stating that they have met with President Roberts over subcontracting.


## Pertinent Contractual Provisions

### Article I—ENABLING CLAUSE


THIS AGREEMENT made this 15th day of August, 2016, between the coal
operators and associations signatory hereto, as parties of the first part (each
coal operator which is a signatory hereto being called "Employer") and the
International Union, United Mine Workers of America (hereinafter called
"Union"), on behalf of each member thereof, as party of the second part,
covers all of the bituminous coal mines described in Article IA, Section (f),
owned or operated by said first parties. This Agreement carries forward and
pre- serves the terms and conditions of all the various District agreements

executed between the United Mine Workers of America and the various operators and coal associations subject to the terms and conditions of this Agreement and as amended, modified and supplemented by this Agreement as herein set out.

This Agreement shall be binding upon all signatories hereto, including those Employers which are members of signatory associations, and their successors and assigns. In consideration of the Union's execution of this Agreement, each Employer promises that its operations covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the Employer's obligations under this Agreement. Immediately upon the conclusion of such sale, conveyance, assignment or transfer of its operations, the Employer shall notify the Union of the transaction. Such notification shall be by certified mail to the Secretary-Treasurer of the International Union and shall be accompanied by documentation that the successor obligation has been satisfied. Provided that the Employer shall not be a guarantor or be held liable for any breach by the successor or assignee of its obligations, and the UMWA will look exclusively to the successor or assignee for compliance with the terms of this Agreement.

WITNESSETH: It is agreed that this contract is for the exclusive joint use and benefit of the contracting parties, as defined and set forth in this Agreement. It is agreed that at operations covered by this Agreement the United Mine Workers of America is recognized herein as the exclusive bargaining agency rep- resenting the Employees of the parties of the first part. It is further agreed that as a condition of employment all Employees at operations covered by this Agreement shall be, or become, members of the United Mine Workers of America, to the extent and in the manner permitted by law, except in those exempted classifications of employment as hereinafter provided in this Agreement. This provision does not change the rules or practices of the industry pertaining to management. The Mine Workers intend no intrusion upon the rights of management as heretofore practiced and understood. It is the intent and purpose of the parties hereto that this Agreement will promote and improve industrial and economic relationships in the bituminous coal industry and to set forth herein the basic agreements covering rates of pay, hours of work and conditions of employment to be observed between the parties, and shall cover the employment of persons employed in the bituminous coal mines covered by this Agreement. Management will not abridge the rights of the Employees as set forth in this Agreement.

## Article IA—SCOPE AND COVERAGE

### Section (a)   Work Jurisdiction

The production of coal, including removal of over- burden and coal waste, preparation, processing and cleaning of coal and transportation of coal (except by waterway or rail not owned by Employer), repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads, and work of the type customarily related to all of the above shall be performed by classified Employees of the Employer covered by and in accordance with the terms of this Agreement. Contracting, subcontracting, leasing and subleasing, and construction work, as defined herein, will be conducted in accordance with the provisions of this Article. Nothing in this section will be construed to diminish the jurisdiction, express or implied, of the United Mine Workers.

### Section (b)    Exemptions Clause

It is the intention of this Agreement to reserve to the Employers and except from this Agreement an adequate force of supervisory employees to effectively conduct the safe and efficient operation of the mines and at the same time, to provide against the abuse of such exemptions by excepting more such employees than are reasonably required for that purpose.

Coal inspectors and weigh bosses at mines where men are paid by the ton, watchmen, clerks, engineering and technical forces of the Employer, working at or from a district or local mine office, are exempt from this Agreement.

All other Employees working in or about the mine shall be included in this Agreement except essential supervisors in fact such as mine foremen, assistant mine foremen who, in the usual performance of their duties, may make examinations for gas as prescribed by law, and such other supervisors as are in charge of any class of labor inside or outside the mines and who perform no production work.

The Union will not seek to organize or ask recognition for such excepted supervisory employees during the life of this contract.

The Employers shall not use this provision to exempt from the provisions of this Agreement as supervisors, more men than are necessary for the safe and efficient operation of the mine, taking into consideration the area covered by the workings, roof conditions, drainage conditions, explosion hazards, and the ability of supervisors, due to thickness of the seam, to make the essential number of visits to the working faces as required by law and safety regulations.

### Section (c)    Supervisors Shall Not Perform Classified Work

Supervisory employees shall perform no classified work covered by this Agreement except in emergencies and except if such work is necessary for the purpose of training or instructing classified Employees. When a dispute arises under this section, it shall be adjudicated through the grievance machinery and in such

proceed- ings the following rule will apply: the burden is on the Employer to prove that classified work has not been performed by supervisory personnel.

### Section (d)   Management of the Mines

The management of the mine, the direction of the working force and the right to hire and discharge are vested exclusively in the Employer.

### Section (e)   Union's Rights

Authorized representatives of the Union shall be per- mitted reasonable access to the mine property to insure compliance with this Agreement. The Employer shall provide candidates for Union office reasonable opportunity to campaign among his Employees during their nonworking hours and in nonworking areas, provided there is no interference with production. The Employer further agrees to provide, to the extent practicable, space on mine property for the holding of Union elections and the ratification of collective bargaining agreements.

### Section (f)   Application of This Contract to the Employer's Coal Lands

As part of the consideration for this Agreement, the Employers agree that this Agreement covers the operation of all the coal lands, coal producing and coal preparation facilities owned or held under lease by them, or any of them, or by any subsidiary or affiliate at the date of this Agreement, or acquired during its term which may hereafter (during the term of this Agreement) be put into production or use. This section will immediately apply to any new operations upon the Union's recognition, certification, or otherwise properly obtaining bargaining rights. Notwithstanding the foregoing, the terms of this Agreement shall be applied without evidence of Union representation of the Employees involved to any relocation of an operation al- ready covered by the terms of this Agreement.

### Section (g)   Contracting and Subcontracting

(1) Transportation of Coal—The transportation of coal as defined in paragraph (a) may be contracted out under the Agreement only where contracting out such work is consistent with the prior practice and custom of the Employer at the mine; provided that such work shall not be contracted out at any time when any Employees at the mine who customarily perform such work are laid off.
(2) Repair and Maintenance Work—Repair and maintenance work of the type

customarily performed by classified Employees at the mine or central shop shall not be contracted out except (a) where the work is being per- formed by a manufacturer or supplier under warranty, in which case, upon written request on a job-by-job basis, the Employer will provide to the Chairman of the Mine Committee a copy of the applicable warranty or, if such copy is not reasonably available, written evidence from a manufacturer or a supplier that the work is being per- formed pursuant to warranty; or (b) where the Employer does not have available equipment or regular Employees (including laid-off Employees at the mine or central shop) with necessary skills available to perform the work at the mine or central shop.

(3) The Employer may not contract out the rough grading in mine reclamation work.

(4) Where contracting out is permitted under this section, prior custom and practice shall not be construed to limit in any way the Employer's choice of contractors.

### Section (h)   Leasing, Subleasing and Licensing Out of Coal Lands

(1) The Employers agree that they will not lease, sublease or license out any coal lands, coal producing or coal preparation facilities where the purpose thereof is to avoid the application of this Agreement or any section, paragraph or clause thereof. Licensing out of coal mining operations on coal lands owned or held under lease or sublease by any signatory operator hereto shall not be permitted unless the licensing out does not cause or result in the layoff of Employees of the Employer.

(2)-(7) These sections have been incorporated into the JOBS Program, Article II, Section (B).

### Section (i)   Construction Work

All construction of mine or mine related facilities including the erection of mine tipples and sinking of mine shafts or slopes customarily performed by classified Employees of the Employer normally performing construction work in or about the mine in accordance with prior practice and custom, shall not be contracted out at any time unless all such Employees with necessary skills to perform the work are working no less than 5 days per week, or its equivalent for Employees working on alternative schedules.

Provided further that where contracting out of such construction work customarily performed by classified Employees at the mine is permitted under this Agreement, such contracting shall be in accordance with prior practice and custom. Where contracting out is permitted under this section, prior practice and custom shall not be construed to limit the Employer's choice of contractors.

## Argument for Arbitrability

The Union's arguments are there is nothing in the contract that permits management to in any way shape or form alter its language.

1. All prior practices and customs not in conflict with the agreement shall be continued.
2. Management and the Union have a long-standing practice and custom of recognizing and processing, grievances filed by Local Union 1810

The argument is a valid deductive argument and the Union will defend the truth of the premises at this time.

## Defense of the Union's Premise Set

In arbitration **Case # 88-23-90-10-PCC**, between <u>Peabody Coal Company, Sinclair Surface Mine and United Mine Workers of America, Local Union 1342, District 23</u>, Arbitrator Robert C. Benedict states on page eleven (11):

> *"In this arbitrator's judgement the company is required to also honor the labor agreement which is a legal contract between the parties and must be considered by the parties as a legal document which governs their conduct in any dispute"*

> *"I agree with the union contention that the question put to Mr. Balckwell was "who was entitled to the work performed?" Until that decision was made it was not necessary for the grievants to request other contractual benefits to which they may have become entitled in the event of a favorable ruling. Once that decision was made in favor of the grievants, it was the company's responsibility to do whatever"*

On page thirteen (13):

> *"The company lost the Blackwell case and failed to follow the award to its natural conclusion i.e., paying the grievants all contractual benefits resulting from the award.*
> ### DECISION

> *"The grievance is sustained in part."*

In Arbitrator's Decision and Award and Certificate of Service, **Grievance No. 2011-12,**between <u>Seneca Coal Company, Seneca Mine and United Mine Workers of America, Local Union 1385, District 22</u>, Arbitrator Lou Chang states on page three (3):

> *"The Employer submits that the sole issue for the Arbitrator to determine in this substantive phase of this arbitration is whether he Employer sold "its operations" within the meaning of Article 1. Employer submits that whether Seneca was bound under Article 1 to provide notice to the Union of its conveyances of coal lands or to secure an agreement from…"*

On page thirty- two (32) and thirty – three (33):

> *"Based upon a review of the entire record presented in this case, the Arbitrator sustains the Union's grievance. The Employer, Seneca Coal Company, LLC, breached its contractual obligation under MOU Q and Article 1 of the WSA 2007 when it transferred substantially all of its MOU Q Exhibit A Coal Lands to sister entities of the Peabody Energy family of companies without having the successor entity or entities undertake contractual obligations contained in the CBA and MOU Q. A proper remedy for such breach of contract …."*

> *"In addition, the Arbitrator also concludes that classified work within the scope of Article II of WSA 2007 has been and is being performed by Seneca Coal Company LLC's successor in connection with the construction of the Sage Creek underground mining portal and associated facilities at the underground portal mining site located on the MOU Q Exhibit A Coal Lands. The Employer, by its actions is selling or transferring the MOU Q Exhibit A Coal Lands to a successor entity or entities who have undertaken mine related work in connection with the construction of the Sage Creek Portal, associated roads, ponds, and facilities has resulted in Grievant Salazar being denied work opportunity for work that Grievant would have been entitled to perform had the Company's successor(s) been required to assume successor responsibilities with the Union. To the extent that he successor ( a subsidiary owned and controlled by Peabody Energy) to the Seneca Coal Company performed work on the MOU Q Exhibit A Coal Lands that would have been work to be performed by classified employees under the Article II of the WSA of 2007 and MOU Q in the work classification(s) noted by Grievant Salazar on his panel card, Grievant Salazar is determined to be entitled to have been called back to perform such work. Grievant Salazar shall be paid back for such lost work opportunity less replacement earnings received by Grievant from*

*replacement job earnings form third- party sources. Together with associated contract benefits. Grievant is entitled to be made whole for the period fifteen (15) days preceding the filing of the instant grievance until a successor agreement is obtained by Seneca Coal Company from the successor sister entity or entities or the earlier termination of an applicable CBA."*

In arbitration **Case # 88-23-89-27-PCC**, between <u>Peabody Coal Company, Sinclair Surface Mine and United Mine Workers of America, Local Union 1342, District 23</u>, Arbitrator Fred Blackwell states on page one (1):

*"This case arises from a grievance filed on May 16, 1989, by grievants jack LeCour, Jerry Singleton, Odell Baker, and Manuel Brown, who allege that work relating to a drainage ditch at the Sinclair Surface Mine in Muhlenburg County which should have been performed by the Grievants due to their status as furloughs Company Employees, was improperly performed by an outside contractor in violation of the Grievants right under the parties' National Bituminous Coal Wage Agreement of 1988."*

*"The requested remedy is that the Grievants be compensated by the Company for all hours worked by the outside contractor."*

*"The Company asserts that no violation of the 1988 Wage Agreement occurred because the performance of the disputed work is not exclusively reserved for the Company's Classified Employees by the Agreement and that on this basis, the grievance should be denied."*

On page nine (9):

*"However, in the final analysis the Company's contentions are found to be inadequately supported by the record evidence and thus not persuasive and instead, the evidence as a whole persuades that the disputed work constitutes rough grading work within the meaning of the provisions of Article 1A (g) (3) of the applicable Agreement which the Company's Classified Employees were entitled to perform."*

*"There is no challenge of record to the Employee's contention that ditching work requiring the use of dozers has always been performed by Classified Employees. Additional confirmation of this proposition is found in a prior panel at the Sinclair Surface Mine, which states that…"*

*On page ten (10):*

> *"The drainage ditches involved in the work performed by the K.R.A. personnel are found on the evidence to be part of the "arranged" drainage to prevent run- off, erosion, and the like as delineated by <u>ARB Decision No. 78-8.</u> The ditches had the same drainage function as the ditches installed by the Company's Classified Employees at the #10-end and the #8 ramp."*

> *"The prepondering evidence of record thus establishes that the disputed work performed by K.R.A. is without question the same type of work that had been regularly performed by the Grievants in the three (3) year period between the end of coal production in late 1985 and their layoff in late 1988.Indeed, the work by K.R.A. relative to the drainage ditch at the #10 – end, removing the pipes from the ditch, shaping its bottom and sides, laying filter cloth, and filling it with rip-rap, for a distance of 1,500 feet, was performed on a drainage ditch which had been installed by the Company's Classified Employees in or about 1986."*

On page twelve (12):

> *"Drainage of water from an unplanned impoundment is clearly work of the type previously performed exclusively by the classified Employees. In addition, inasmuch as the record contains no evidence whatever that washing or erosion of vegetation was occurring in this area, there is simply no basis at all on which this work could be said to be associated with erosion control on reclaimed land"*

### *DECISION AND AWARD*

> *"The preponderating evidence of record establishes a company violation of the 1988 Coal Wage Agreement, Article 1A (g) (3), as per the opinion and on that basis, the grievance is hereby sustained."*

In arbitration **Case # 07-17-07-004**, between <u>Eastern Associated Coal, LLC. and United Mine Workers of America, Local Union 1503, District 17</u>, Arbitrator Thomas Phelan states on page five (5):

> *"The Company, on the other hand, maintained that the contracting out of the work at Pond #7 did not violate the work jurisdictional rights of the grievants. It did not dispute the fact that the grievants had jurisdiction over the work involved in cleaning Pond #7 when that pond was being used by the Rivers Edge Mine which was a signatory operation. It argued, however, that the grievants' jurisdiction over that*

*work at Pond #7 ceased when the Rivers Edge Mine stopped using the pond and it was taken over by the Black Stallion Mine. Black Stallion was a non –signatory operation which has never assigned work jurisdiction to the grivants either at Pond #1 or Pond #7, and the cleaning of the retention pond at the Black Stallion Mine had always been contracted out since the mine began in 2006.the contracting out in question in this case was done for the benefit of the Black Stallion Mine, not the Rivers Edge mine, so the grievants did not have jurisdiction over the work."*

On page seven (7):

*"The grievants here are classified Employees of Eastern Associated and they are part of the road crew in the Shaft Department. They had been assigned by Eastern Associated to clean Pond #7 since it was first constructed in 2003 to handle and hold pumped mine water from the Rivers Edge Mine, and the grievants thereby acquired work jurisdiction over the cleaning on Pond #7 at that time. Rivers Edge stopped using Pond #7 sometime in mid- 2006, but at the same time or shortly thereafter, the Black Stallion Mine began using it for its pumped mine water. Black Stallion had been using Pond #1, which was immediately adjacent to Pond #7, and the two ponds were plumbed together in order to expand Black Stallion permitted area for pumped mine water."*

*"The issue to be decided her is whether this change in the use of Pond #7 from Rivers Edge to Black Stallion allowed Eastern Associated to contract out the cleaning of the pond. The Company's argument is that because Black Stallion is a non-signatory operation, the grievants no longer have jurisdiction over the work. In my view, however, this argument must be rejected. The cleaning of Pond #7 had always been performed by classified Employees of Eastern Associated, not Employees of Rivers Edge. That indicates that it was Eastern Associated that was responsible for cleaning of the pond even though it was the mine water from Rivers Edge Mine that was being pumped into it and the West Virginia Department of Environmental Protection had issued a permit for the Rivers edge Mine to pump the mine water to the pond."*

*"There was no evidence presented here to show that he responsibility of Eastern Associated to clean Pond $7 changed when Black Stallion obtained a permit from the State to pump its mine water to Pond #7. In fact, since Eastern Associated was the one that contracted out the cleaning of Pond #7, it appeared that Eastern Associated was still*

*responsible for the cleaning. Article 1A, Section (a) of the National Agreement directed that the classified Employees of Eastern Associated perform that work in Pond #7, and their grievance claiming the work will therefore be sustained, The grievants are entitled to be compensated for the same amount of time spent by the contractor performing this work in order to make them whole."*

In **Arbitration Case # 93-23-94-01 (B-1 Panel)**, between <u>Island Creek Coal Company, Hamilton Number 1 Mine and United Mine Workers of America, Local Union 1564, District 23</u>, Arbitrator Anne Holman Woolf, states on page ten (10):

*"The ARB ruled in Decision 78-8 that Article 1A, Section g(3) included drainage (being) .. "arranged" to prevent run-off, erosion, and the like " as part of the activities included in "the rough grading in mine reclamation work." The arbitrator understands Decision 78-8 interprets Article 1A, Section g(3) to prohibit the contracting out of the work done by the contractor's employees in "redoing" the primary drainage ditch, including the construction of the 17 small dams. The argument by the Company that contractors in the past have laid down ditches is not persuasive because the prior event was part of the drainage from the lime plant and not part of reclamation work. Further, the ARB ruled in Decision 78-8 that rough grading activities include drainage ditches and such activities are protected from contracting out. <u>The arbitrator finds that</u> the Company violated the Agreement when it contracted out the work has been described as the "redoing" of the primary ditch, including the construction of the 17 small dams."*

In **Arbitration Review Decision # 78-8**, between <u>Walker- Fayette Coal Company and United Mine Workers of America, Local Union 1794, District 20</u>, Arbitrator Roger C. Williams, states on page nine (9):

*"As such, as the BCOA Intervention Brief points out, where such agreements are in in issue, the agreements are entitled to the presumption that, absent clear conflict, the efforts of the local parties to make such adjustments are to be construed as binding as the necessary local adjustments authorized by Article XXVI, section (b)."*

*"Thus, the subject matter of the agreement is to be examined. The subject matter is that part of ultimate land reclamation involving preparing soil for, and the planting of, vegetation, whether grasses or other forms of vegetation cover. It is essential to make sure what the limitations of the subject matter are. The work involved is that which is*

*performed after the pit has been filled, the general rough grading of the subsoil spoil and fill has been accomplished, top soil has been restored to the extent required and that top soil has been spread and "rough graded."  At this point, the surface has been restored to its original contours, drainage has been "arranged" to prevent run-off, erosion, and the like and the top soil graded to receive vegetation."*

On page ten (10):

*"Consequently, there should be no question that work jurisdiction over reclamation extends to rough grading as an integral part of the coal production and removal of overburden process, since the law requires restoration of overburden as a part of the surface mining process."*

On page elven and twelve (11 and 12):

*"Such past practice and local agreements in clarification of ambiguities in the National Agreement are manifestly not in conflict with the Agreement; they are, instead, not only binding interpretations between the local parties until the National Agreement is negotiated to speak to the matter but such clarifications by past practice and local agreement are expressly authorized and made binding between the local parties by Article XXVI, section (b).*

*"... utilized in almost every agricultural activity, including trucks, devices to pull machinery, such as the D-5 dozer in this case, and the forklifts t load the trucks. If the work is agricultural, and the parties to this local agreement have agreed that it is, then clearly agricultural workers are going to operate the machinery involved. Such operation and such activity within the limited scope of this local agreement, therefore, also does not infringe upon the work jurisdiction reserved in Article 1A, section (a)."*

*"... and applying to the Employer's Carona Mine is reestablished as governing the activities of the Farm Crew at the Carona Mine, and it may be implemented as written."*

## Final Remarks

Arbitrator Bowers, The Union does not see any merit to dismiss the case on any procedural format.  We humbly request that you rule that you have jurisdiction over this case and similar cases and hear the merits of the case.

Thank you

Rick Altman
International Field Rep.
UMWA District 31 Sub 6
260 Bethany Pike
Wheeling, WV. 26003
raltman@umwa.org