IN THE MATTER OF ARBITRATION
UNDER THE
2016 COAL WAGE AGREEMENT
BETWEEN THE
UNITED MINE WORKERS OF AMERICA AND
THE OHIO VALLEY COAL COMPANY

BETWEEN

| | |
|---|---|
| THE OHIO VALLEY COAL COMPANY | ) ARB CASE #: 16-31-17-021 |
| | ) |
| AND | ) ARBITRATOR: MOLLIE H. BOWERS |
| | ) |
| UNITED MINE WORKERS OF AMERICA | ) HEARING:  SPRINGFIELD SUITES |
| | )               WHEELING, WV |
| DISTRICT 31, SUBDISTRICT 6 | ) |
| LOCAL UNION 1810 | ) |
| | ) |
| GRIEVANT(S): TOM HOLLAND, AND | ) DATE:  SEPTEMBER 20, 2017 |
| MIKE HORSTMAN | )               9:00 A.M. |

CLOSING STATEMENT FOR MANAGEMENT

THE GRIEVANCE:

"On 03-09-17 Company violated ART. 1a sec g-2 XXVI sec. b and other pertinent provisions of the contract.  Company has dozer taked out for repair 6 m  This is our work we have always done asking be made whole in all matters an cease in Dist from this action or practice. (Sic)

THE ISSUE:

Do the provisions of Article 1A, Section (g)(2) and/or Article XXVI, Section (b) have any application at the **permanently closed** Powhatan No. 6 Mine, after all production permanently ceased on October 14, 2016? *(More specifically to the instant grievance, did the Employer ("Employer" or "TOVCC") violate any of the terms of the 2016 Coal Wage Agreement ("CWA" or "Agreement") when it sent a Caterpillar D-6 Dozer to an outside Contractor for certain repair and maintenance work?)*

Exhibit J

## PERTINENT CONTRACT LANGUAGE

**Article I - ENABLING CLAUSE Article IA** - *Section (a)* **Work Jurisdiction**
Article IA, *Section (d)*  **Management of the Mines**
Article IA, *Section (g)* **Contracting and Subcontracting**
**Article XXIII** - *Section (k)*  **Prior Agreement**
**Article XXIV** - *Section (b)*  **Prior Practice and Custom**

Considering the appearance of complexity of the question before the Arbitrator,

we will proceed with these Arguments in two (2) Parts with supporting Exhibits as

follows:

> **PART I:**   A CLOSED NON-PRODUCING MINE IS NOT AN "OPERATION" AS
> CONTEMPLATED BY AND PURSUANT TO NBCWAS OR THE 2016
> CWA BETWEEN TOVCC AND THE UMWA
> *(EXHIBIT #1 THROUGH EXHIBIT #11)*

> **PART II:**   ARTICLE IA, SECTION (A) WORK JURISDICTION HAS NO
> APPLICATION AT A CLOSED NON-PRODUCING FACILITY
> *EXHIBIT #12 THROUGH EXHIBIT #35)*

We begin with Part I which, goes to the heart of the merits of the grievance

before you today, and, alone should dispense with the need to go further with these

arguments.

## PART I
### A CLOSED NON-PRODUCING MINE IS NOT AN "OPERATION" AS CONTEMPLATED BY THE 2016 CWA AND NBCWAs

The Court decisions, which follow in this part of our arguments, support the conclusion that the application of the Agreement is limited to an **active**, **operating**, **producing coal mine**, e.g., an "**operation**." In the Enabling Clause the parties agreed that " . . . "Employer" promises that its **operations** covered by this Agreement shall not be sold . . . without . . . first securing the agreement of the successor to assume the Employer's obligations under this Agreement. . . .

Then, Article IA, Section (a) Work Jurisdiction describes the work involved in the **production of coal** at an **active**, **operating**, **producing coal mine**, or "**operation**", as being within the jurisdiction of classified hourly employees (more on this later).

As will be shown by numerous and consistent prior decisions by Arbitrators and Courts, the provisions of the Agreement contemplate an **operating, coal producing** mine, and that once the mine ceases to be an **operation**, application of the Agreement also ceases and the work jurisdiction of classified employees likewise ceases to exist [except for Article IA, Section (g) (2) "**rough grading** in mine reclamation".] TOVCC contends that what all of this means at a closed mine is that since the Powhatan #6 Mine permanently ceased mining coal on **October 14, 2016,**

any practices that previously emanated out of the **"production of coal"**, and any

work related to the **production of coal**, cannot stand because of the change of the

predicate underlying any such practices, relating to work jurisdiction.   Said

differently, at the present time, since the permanently closed Powhatan No. 6 Mine

is no longer an **"operation"**, the terms of the Agreement do not apply to the

performance of **any** work being performed at the closed mine site (even if it had been

previously been performed by classified employees).  The only exception to this well-

settled rule is when the work being performed constitutes "... rough grading in mine

reclamation work. . . .".

We recognize that most, if not,, all of the following citations are based upon

the terminology contained in the various National Bituminous Coal Wage

Agreements, and we also recognize that the terms of Articles I and IA of the

NBCWAs may not be  verbatim identical to those contained in Articles I and IA of

the 2016 CWA.  However, after studying the provisions of both of those agreements,

we are confident that you will agree that the following citations apply equally to the

2016 CWA and the NBCWA.

Please note that each of the Federal Court Decisions, which follow in this

portion of our position, were introduced in another arbitration proceeding before

Arbitrator Beckman on September 9, 2004, and he spoke to and relied upon them in

his decision dated October 25, 2004. We will introduce a copy of Arbitrator Beckman's "landmark decision" in the next section of these arguments as our Exhibit #34 and discuss it further then.

Our first citation is among the first U.S. District Court decision rendered in Utah nearly thirty (30) years ago. It is referred to by nearly every related decision written after it. It, like the many decisions that followed it, holds that the Mine that had permanently ceased all production, was no longer an **"operation"** that was subject to the NBCWA of 1984.

Exhibit #1:    **D-861-2**
U.S. District Court of the District Of Utah, Central Division, in <u>U.S. Steel Mining Company, Inc. and Kaiser Steel and UMWA Local Union 8003, District 22</u>, decided April 21, 1986.

See pages 6, 7 and 8:

> "Determination of whether U. S. Mining was bound under Article I of the 1984 NBCWA to secure the unconditional agreement of Kaiser to assume U.S. Mining's obligations under the 1984 NBCWA in connection with the sale of the Geneva/Horse Canyon Mine **turns on whether Kaiser purchased an "operation" within the meaning of Article I of the 1984 NBCWA**.
>
> Based on a careful reading of the 1984 NBCWA and the entire file, this court is convinced that, **as a matter of law, a mining "operation," for purposes of Article I of the 1984 NBCWA, refers to a mine site or facility where active coal mining operations are being conducted. That is, an "operation" connotes a mine that is actively producing coal and operating as a coal mine**. Thus, **a mine that has ceased to function as an active coal mine is not an "operation**," . . . . Nevertheless, "while it is true that great care must be exercised to safeguard bargained and earned rights, **it is equally important that it be recognized that they are limited to the contractual language which embodies them**."

". . . Based on these undisputed facts, the court is of the opinion that Kaiser did not purchase an "operation. 3/ . . ."

. . . . .

*"3/   The UMWA contends that for purposes of the successorship clause, Article I of the 1984 NBCWA, an "operation" is transferred when the capacity to mine coal is transferred.   Accordingly, the UMWA argues that when U.S. Mining transferred all of its rights to mine coal from the Geneva/Horse Canyon Mine, which apparently has 5 million tons of recoverable reserves and is capable of producing coal, U.S. Mining transferred an "operation" to Kaiser within the meaning of the successorship clause, Article I of the 1984 NBCWA.   The court disagrees.   Based on the court's reading of the 1984 NBCWA and the materials presently before it, the facts that Kaiser has the legal right to operate a mine that has been closed and abandoned in good faith and that the mine has recoverable reserves and is capable of producing coal do not mean the Kaiser purchased a mining "operation."* (emphasis added)

We believe the language emphasized above equally applies to the permanently closed Powhatan No. 6 Mine, which permanently **ceased producing coal** on October 14, 2016.   The Mine's entries have been permanently sealed, and is in "**closed mine**" status.

Our next citation involves the same Mine as in Exhibit #1.   It is a decision by the Bankruptcy Court for the District of Colorado.   In deciding this matter, this Court reviewed and relied on the conclusions of the earlier Court decision cited as our first exhibit.

Exhibit #2:   **D-891-1**
U.S. District Bankruptcy Court District of Colorado in <u>Kaiser Steel Corporation</u> decided February 15, 1989.

See page 2:

"There is the threshold question as to whether the collective bargaining agreement is in effect as to operations at these properties.   First of all, the Court

notes, as stated above, that pursuant to Article IA,(f), **the contract was only to be applied to properties acquired by Kaiser during the term of the agreement which had been** "**put into production or use**." . . ."

Then on pages 5 and 6:

"Even if the Court were to assume that the collective bargaining agreement is still in effect, the objections of the UMWA are still not well taken. **The Court has examined the authorities presented by the UMWA and believes that they do not support its position. To the contrary, the proper rule in these matters has been established by the district court** in the case of <u>United Mine Workers of America, International Union v. U.S. Steel Mining Company, Inc.</u>, 636 F.Supp. 151 (D.Utah 1986). In that case the district court held:

Based on a careful reading of the 1984 NBCWA and the entire file, this court is convinced that, as a matter of law, **a mining "operation," for purposes of Article I of the 1984 NBCWA, refers to a mine site or facility where active coal mining operations are being conducted. That is, an "operation" connotes a mine that is actively producing coal and operating as a coal mine. Thus, a mine that has ceased to function as an active coal mine is not an "operation," assuming the mine was closed in good faith.** <u>Ibid</u>, 363 F.Supp. at 153-54."

\* \* \* \* \*

"The arguments of the UMWA had been considered and were expressly rejected by the district court in the <u>UMWA v. U.S. Steel</u> case referred to above, <u>supra</u>. The UMWA disputes the efficacy of the district court opinion and has cited to the Court decisions of the Arbitration Review Board ("Board"). The decisions cited by the UMWA, in the Court's view, not only do not further the UMWA's case but, in fact, lend support for the propriety of the district court's decision in the <u>UMWA v. U.S. Steel</u> case."

Then on page 8:

"**The choice of the word** "**operations**" **is meaningful**. It connotes something more than the sale of a piece of machinery. **It contemplates the transfer of an active producing property**. . . ." (Underlining only by Court, other emphasis added)

Our third citation is a decision by the U.S. Court of Appeals for the Tenth

Circuit, which reviews and confirms the lower Court in our Exhibit #1.

Exhibit #3:    **D-901-1**
U.S. Court of Appeals for the Tenth Circuit in U.S. Steel Mining, Inc., and
Kaiser Steel Corporation and UMWA Local Union 8330 (sic), District 22, decided
February 5, 1990.

In upholding the District Court ruling the Appeals Court stated the following

on page 3:

> "The central issue is whether the obligations imposed by the successorship
> clause of the NBCWA required U.S. Mining to secure the agreement of Kaiser to
> accept the responsibilities under the NBCWA in connection with the sale of the
> Geneva/Horse Canyon Mine. **The district court correctly focused on whether**
> **Kaiser purchased an** "**operation**" **within the meaning of the successorship**
> **clause**."

Then on pages 4 and 5:

> "UMWA argues the district court erred by holding that the term "operations"
> in Article I of the NBCWA refers to mines that are actively producing coal. . . .
>
> In construing the term "operations," the district court relied on District 6,
> UMWA v. North American Coal Corporation, No. C-279-242 (S.D. Ohio 1980). In
> North American, the mine at issue was sold over a year after the mine ceased
> operating and 11 months after announcement that the mine would not be reopened.
> . . . Therefore, since there was no sale of an "operation" as contemplated by Article
> I of the NBCWA, North American did not violate the successorship clause by failing
> to secure the subsequent buyer's agreement to assume North American's obligations
> under the collective bargaining agreement."

Finally on page 8:

> "We are convinced that the district court's ruling on the contract question was
> correct 3/ and accordingly the judgment is

**AFFIRMED**.

_____

3/

    *UMWA strenuously argues that Article XVII of the NBCWA, which concerns recall and seniority rights of members when a mine is closed or abandoned, is at odds with the district court's decision that the term "operation" contemplates an active and producing mine before the successorship clause becomes applicable. We are not persuaded. The mere fact that language in Article XVII allows employees of an abandoned or closing mine to transfer to other active mines of the same employer does not compel the conclusion that the Article I successorship clause applies to the sale of a mine that is no longer operating, but was closed in good faith."*

                        (Underlining only by Court)
                              (Emphasis added)

Our next citation is from a decision issued by The United States Court of

Appeals, Second Circuit, which was referred to in the just cited Tenth Circuit Court

of Appeals.

Exhibit #4:   **D-891-4**

    U.S. Court of Appeals for the Second Circuit in <u>LTV Steel Company, Inc. and United Mine Workers of America</u>, decided December 12, 1989.

    See page 1039:

      "In contrast to those arbitration cases, this case does not involve a mine that has been temporarily closed; one that is subject to possible recall of idled workers to the same job site. **The Republic Kentucky Mine has been permanently shut down, and it is highly unlikely that the operation previously conducted there will be resumed**. The market conditions that make it unprofitable for Tuscaloosa to conduct its drift mining operation apply equally to the purchaser. Subsequent mining activity therefore will have to be an entirely different operation, such as open pit mining. And, because the equipment required is intimately connected with the method of extraction, different equipment will be needed and the actual mining site would be at a different location on the 3000 acre property. Any subsequent operation would therefore be completely distinct from Tuscaloosa's operation that worked the mine by underground methods through shafts and drifts.

[If the intended purpose of the successorship clause has been frustrated, it is due not to the trial court's construction of the Agreement but to market realities governing the production of coal.] <u>We believe the meaning of the word "operations" should cover those methods of coal mining, production, preparation, transportation and other ancillary activities in which the union and Tuscaloosa were engaged during the effective term of the Agreement between them. In this case, none of those methods or activities were engaged in after the mine was idled over three years ago in 1986. As a consequence, the benefits of Article I, such as recall and seniority rights to the drift mining operation, did not survive the permanent shutdown of the mine, and no obligation remains for the purchaser to assume.</u>"   (emphasis added)

Recognizing that the just cited four (4) decisions deal with sale/successorship issues, one can easily compare the "<u>operation</u>" definitions for purposes of defining work jurisdiction at a <u>closed</u> <u>non-producing</u>  Mine pursuant to Article IA, Section (a) of the  20146 CWA and NBCWAs.

The  next citation is a decision by the U.S. District Court for the Western District of Virginia, which also addressed the term "<u>coal mining operations</u>" and goes on to find that the word "<u>operation</u>" has a special meaning to the parties.  The Court found that when Arbitrator Ables decided  the issue before him without addressing that special term, his  decision had to be vacated.

<u>Exhibit #5</u>:   **D-821AH-11**
U.S. District Court for the Western District Of Virginia in <u>Clinchfield Coal Co.</u>, decided January 27, 1983.

See pages 16, 17 and 18 of Court Decision 82-0314-A:

"On page 12 of the opinion, Ables acknowledges that one of four arguments made by Clinchfield is that it has not licensed out any "coal mining operations." <u>Having recognized the issue, he never addresses it.  Thus, the decision of the</u>

> **arbitrator in effect holds that the words "coal lands" in paragraph one of Section IA(h) is (sic) the same as "coal mining operations" in paragraph two.**
> . . . **While the word "license" has a meaning, so does the word "operation."**  As this court has pointed out previously, all words in these contracts have special meaning to the parties.  For example, "employee," "employer," "classified," "in and around the mine," "signatory," and many others have grown over the years by interpretation to have special meaning. . . .

It is apparent from Article IA Section (f) entitled "APPLICATION OF THIS CONTRACT TO THE EMPLOYER'S COAL LANDS" that the contracting parties were aware of the literal distinction between naked coal lands and coal mining operations.  This provision states as follows:

> This agreement covers the operation of all coal lands, coal producing and coal preparation facilities owned or held under lease by them. . . . This section will immediately apply to any <u>new operations</u> upon the Union's recognition, certification, or otherwise properly obtaining bargaining rights.  Notwithstanding the foregoing, the terms of this agreement shall be applied without evidence of Union representation of the employees involved to any relocation of an operation already covered by the terms of this agreement.

Section (f) therefore binds the employer to continue to have Union representation if the employer relocates a coal mining operation, but if a new operation is begun by an employer, the agreement is not in effect until the Union has obtained bargaining rights; whereas, section (h) carries the agreement one step further and requires an employer to maintain jobs for its employees when it licenses out coal mining operations.  **Reading these sections as a whole, they cover all of an employer's operations and its subsidiaries' and affiliates' operations, but nowhere is it specified that it applies to operations of independent contractors of the employer.**

**All collective bargaining agreements between BCOA and the UMWA are not conceived in a vacuum; each side has lawyers scrutinizing every word in light of old interpretations. . . .**

Since Clinchfield has not licensed out "**coal mining operations**" it has not violated Article IA Section (h), second paragraph.  **Further**, the arbitrator never decided this issue.  **Therefore, the award is not** "**final**. . . ."

(Underscoring only in original)<br>(Emphasis added)

\

We next quotations are from a decision by the U.S. Court of Appeals for the Fourth Circuit that is attached to our Exhibit #5. The Court of Appeals reviewed the above cited District Court decision. The Court of Appeals upheld the lower Court decision. See their remarks on pages 6 and 7:

> ". . . . Nonetheless, the award must "draw its essence" from the collective bargaining agreement.
>
> [A]n arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources; yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.
>
> . . . Furthermore, "the arbitrator must take into account any **existing common law** of the particular plant or industry, for it is an integral part of the contract".
>
> The district court held that Arbitrator Ables's (sic) award did not "draw its essence" from the Agreement because the arbitrator (1) "ignored or overlooked and failed to interpret the words `coal mining operations'" as used in ¶ 2 of article 1A (h), (sic). . . . Because we agree with the first two of these criticisms, we likewise conclude that the award did not draw its essence from the Agreement.
>
> . . . Instead, they dispute whether Arbitrator Ables determined that there had been licenses of "**coal mining operations**." Clinchfield claimed before the arbitrator that it had licensed only "coal lands" and not "**coal mining operations**."

Then on page 8:

> "The district court found that Arbitrator Ables neither discussed nor decided the issue of whether "coal mining operations" or "coal lands" were licensed. **The district court also reasoned that the terms had special legal meanings to the parties and that "the contracting parties were aware of the literal distinction between naked coal lands and coal mining operations**." The district court further found that Clinchfield had not licensed out any ongoing **coal mining operations**. . . ." (emphasis added)

In the following Panel Arbitrator's decision, veteran industry Arbitrator Vierthaler ruled that the term "**coal mining operation**" contemplates that coal is being mined.

Exhibit #6:   **D-861AH-6**
    Arbitrator John J. Vierthaler in Eastern Associated Coal Co. and UMWA Local Union 9177, District 17, decided July 15, 1986.

See pages 10 and 11:

> ".... **The term "coal mining operations" carries with it the plain meaning that coal is being mined or processed.** . . ."

> * * * * *

> "The distinction between "coal lands" and "**coal mining operations**" is also evident by a reading of Article IA, Section (f). This provision also mentions "**new operations.**" Here a new operation is not subject to automatic certification of the Union except after the Union's properly obtaining bargaining rights."

Then on page 12:

> "**In conclusion on this point, it is my opinion that the Company has not leased or licensed out a "coal mining operation" as that term is used at the second paragraph of IA(h) (1).**
>     A similar discussion would ensue pertaining to Article IA(h) (2). Here leasing out, as well as licensing of "**coal mining operations which at any time were in operation by that Employer**" . . . can only be done by compliance with certain conditions. Again, the result would be the same. **Here the language is even more clear as to coal mining operations which were in operation. As the Company has not leased or licensed a coal mining operation, but only coal lands, the provisions of IA(h) (2) do not come into play.**" (emphasis added)

Our next series of citations emanate from BethEnergy, and they also involve the definition of what constitutes an **operation** beginning with a decision by Arbitrator Render that was subsequently vacated by the Courts.

Exhibit #7:   **D-861-7**

 Arbitrator Edwin R. Render in <u>Beth Energy Corporation and UMWA Local Union 5741, District 30</u>, decided November 24, 1986.

See pages 14 and 15:

> ". . . A description of the wide variety of business entities that are signatory to the Contract is essential to an understanding of the word "**operations**" which is a key word in the second paragraph or Article I.  The second paragraph of Article I contains an understanding that

>> each employer promises that **its operations** covered by this Agreement shall not be sold, conveyed, or otherwise transferred or assigned to any successor without first securing the agreement of the successor to assume the employer's obligations under this Agreement.

>> Given the wide variety of "coal operators and associations" that are signatory to the contract, and considering the fact that some of these signatory companies conduct their operations through lessees and licensees, **it appears to the Arbitrator that the word "operations" as used in the second paragraph of Article I is broad enough to cover the coal land which the Company leased to Manning Coal Company on December 31, 1985.**  Nothing has been brought to the Arbitrator's attention which would lead him to the conclusion that the negotiators of the Contract intended that the word "**operations**" to exclude coal lands.

>> Accordingly, **the Arbitrator concludes that the Company has violated its obligation under Article I of the Contract to refrain from transferring its operations to a successor without securing the agreement of the successor to be bound by the terms of the National Agreement**. . . ."

(Emphasis added)

Arbitrator Render's decision was appealed to and reviewed by the Magistrate for the U.S. District Court for the Eastern District of Kentucky.  In recommending that Arbitrator Render's decision be vacated, Magistrate Hood stated the following after reviewing the language contained in Article I and Article IA, Section (f) and (h) (1) as well as the Clinchfield case that we cited <u>supra</u>.

Page 14 of 64

<u>Exhibit #8:</u>   **D-881-1**

U.S. District Court, Eastern District of Kentucky, Pikeville in <u>BethEnergy</u> <u>Mines, Inc. and UMWA Local Union 5741, District 30</u>, decided January 29, 1988.

See page 7:

"A thorough examination of the arbitrator's opinion discloses that he did not attempt to discuss any distinction between a coal mine operation actively mining, producing, and shipping coal to market and coal lands upon which there was no coal mining activity. **The arbitrator simply concluded that "operations" includes the term "coal lands" by reason of the varied nature by which the signatories conduct their coal-related activities**. **This is not a valid basis for determining whether or not "operations" includes "coal lands" upon which the signatory lessor has no coal mining activity**. He totally ignored the history of these terms in the collective bargaining agreement. **The plain meaning of "operations" does not include "coal lands."** The arbitrator's decision is contrary to the express terms of the Agreement and fails to "draw its essence from the collective bargainging (sic) agreement. . . ." (Underlining only by Court, emphasis added)

Then, our next citation by the reviewing Court, is the adoption of the

magistrate's report and recommendation.

<u>Exhibit #9:</u>   **D-881AH-1**

U.S. District Court, Eastern District of Kentucky, Pikeville in <u>BethEnergy</u> <u>Mines, Inc. and UMWA Local Union 5741, District 30</u>, decided June 3, 1988.

See pages 2 and 3:

"Subsequent to a *de novo* review of the record, including the Union's objections to the magistrate's report and recommendation as well as the response, reply and surresponse thereto, the court is of the opinion that this matter should be resolved along the lines of the magistrate's report and recommendation and that the objections thereto are without merit and should be overruled. . . .

**In the instant case, the record clearly shows that "coal lands" is not included within the meaning of the term "operations." This interpretation is supported by prior arbitration awards, federal court cases which have addressed this issue, and the differentiation of such terms as found in other provisions of various relevant national employment and wage agreements.** As such, the magistrate correctly concluded that the arbitrator's award should be vacated because it ignored the plain meaning of the term "operations." . . ."

\* \* \* \* \*

"2. The magistrate's report and recommendation is **ADOPTED** in its entirety as the finding of fact and conclusions of law of the court."   (Underlining only by Court, other emphasis added)

Each of the just cited decisions must lead to the conclusion that an "**operation**", as that special term is used and given meaning in the coal mining industry, is an **active coal producing entity**.   Consequently, if "**the production of coal**" is a mandatory predicate for the application of Article 1 Enabling Clause, the same **predicate** must apply for Article 1A, Section (a) Work Jurisdiction to have any application.

The next citation also offers some guidance as it relates to the definition of an "**operation**".   In this decision the Arbitrator relies on the teachings of the Fourth Circuit Court of Appeals, which is attached to our Exhibit #5.

Exhibit #10:   **D-841AH-1**
Arbitrator D. Grove Moler in Cannelton Industries and UMWA Local Union 8843, District 17, decided March 2, 1984.

See pages 37, 38 and 39:

"DOES THE COMMON SENIORITY AGREEMENT
EXTEND TO THE MAR-SAN LEASE

Although by virtue of Judge Copenhaver's decision, the 1967 common seniority agreement is alive and well so far as it is applicable  to the possibility of reopening by Cannelton of the closed mines and the ongoing of Mine No. 130 (if not heretofore closed) it does not necessarily follow that it extends to and renders void the lease and contract with Mar-San.  This Arbitrator cannot find authority in the collective bargaining agreement itself or the submitted decisions of the Arbitration Review Board or of other Arbitrators to so hold, absent clear and convincing proof that, by executing the Mar-San lease and contract, Cannelton did so with the purpose

of avoiding the obligation of contract, or thereby caused lay off of employees.

Seniority is a creature of contractual relations between Employer and Employees. It is not tied to coal land or seams, as such, or to particular pieces of equipment. A.R.B. 82-16-KD-124 Kessler Coals, Inc. and Local Union No,. 6529, UMWA; Local Union 9619, District 17, UMWA and Central Appalachian Coal Company, (Jan. 1974) in which **Arbitrator Paul Selby, Jr. found work jurisdiction for seniority purposes to be confined to a mining operation and not a coal seam;** A.R.B. 81-17-81-L37, Local Union No. 6594, District 17, UMWA and R. V. And B. Coal Company and A.R.B. 78-17-78-L28, Local Union No. 5867, District 17, UMWA and J. L. & J. Coal Company **in which the undersigned Arbitrator reviewed a number of other arbitration decisions and different fact situations, and held that seniority is tied to mining operations and contractual relationships, not land or machinery, as such.** The use of the phrase "coal lands" in Article IA Section (f) and (h) of the Coal Wage Agreement when read together with all other provisions of that Agreement **does, ipso facto, not extend the range and work jurisdiction of any particular operating unit.** It is vested only within the application of the collective bargaining agreement to the individual contracts. J. I. Case Co. V NLRB, 321 U.S. 332. **It speaks to relationships between individual Employees and their Employer, and between contesting Employees. It is extended only so far as a signatory Employer opens and operates a facility.** It reaches a "successor" to the Employer's mining operation, or a "successor" to a Lessee's mining operation by virtue of explicit language of the collective bargaining agreement. **It cannot be concluded from "the essence of the contract" that a lessee opening for the first time a new mine, not connected in any way with a prior operating facility, is as trespasser upon the seniority rights of Employees at other unconnected facilities.** To so hold is to hamstring a landowner in the exercise of its property rights and hinder the recovery of pockets of coal as well as possible efficient development of larger reserves. . . ."

Then on pages 40, 41 and 42:

". . . This Arbitrator cannot base a decision upon a crystal ball prophecy of what might be the long range effect of refusing to void an existing lease which, from the evidence, does not appear to be a device for intentional evasion of contractual obligations.

. . . **Whether the owner operates itself or chooses a licensee or lessee is a judgment which the collective bargaining agreement reserved to it.** It is only limited by clear violation of the contractual obligations. . . . The rationale of the decision of the Fourth Circuit Court of Appeals, No. 83-1147, in the case of Clinchfield Coal Company et al v District 28, UMWA and Local Union 1452 recognizes that there may be more reasons for leases or licenses than schemes to avoid contract obligations."

Then on page 43:

> "Another argument raised which should be addressed is the contention, supported by a number of arbitration decisions* to the effect that the use of the words **"at a mine"** as used in Article XVII (a), (b) (h): "at mines" in Article XVII (b); **"choice of the mines"** as used in Article XVII (c): **"other mines"** in Section (f); **"at the mine"** in Section (g) together with "another operation"; "of the mine" as used in Section (i); "a mine" as used in Section (k), **all dealing with "SENIORITY",** **restricts bidding rights to a single operational unit and render common** **seniority a violation of the collective bargaining agreement. This approach is** **soundly grounded on the language of the Coal Wage Agreement, and bears the** **weight of traditional repetition...."**

Then on page 44:

"SUMMARY"

* * * * *

> "3.   **Seniority is tied to contractual relations, not coal land, seams or** **equipment, as such, and extended to "successors" by explicit language of the** **Coal Wage Agreements."**

Finally on page 45:

> "7.   **The opening of a new mine in a location not previously exploited, by** **a genuine third party Lessee, which is not a "successor" mining operation, and,** **particularly, where the owner or Lessor would not normally have mined, is not** **ipso facto, a contractual violation, even though one of the results might be** **refusal of the Lessee to recognize or accept common seniority covered by a** **special agreement or past practice between the Lessor and its former** **employees."**  (Underlining only by Arbitrator, other emphasis added)

Our next citation in this section the most recent decision on this subject by the United States District Court of Appeals for the Sixth Circuit further defining that a non-producing facility is **not** an "**operation**" for purpose of application of the NBCWA (or the CWA of 2016). (Note: Not sur if this needs changed)  It appears that this Court of Appeals gave deference to the earlier decisions as we are urging you to do in the instant dispute.

Page 18 of  64

Exhibit #11:   **D-20031-1**

In the United States District Court of Appeals for the Sixth Circuit in <u>Apogee Coal Co., Arch Coal Inc., and Ark Land Co.</u>, decided June 5, 2003.

See pages 3 and 4:

"Beginning in September 1997, Mine No. 37 lost several million dollars. **Apogee management** was unable to develop a profitable business plan and eventually **closed Mine No. 37 in January 1998.** In a letter dated January 30, 1998, Apogee informed UMWA-represented employees that **production had ceased and that the facility closure was permanent**. All of Apogee's UMWA-represented workers at the Lynch mining complex were laid off, with the exception of certain senior employees at the Cave Branch coal preparation plant, who were retained to process and load previously mined coal, and certain salaried mine foreman, who were retained to retrieve and remove all salvageable equipment from Mine No. 37. All equipment was moved out of Mine No. 37, and the power and ventilation were both cut off. By June 1998, all deep mine portals associated with any of the mines held, operated, or developed by Apogee in and around the Lynch mining complex had been sealed. In a hearing before the district court on September 7, 2001, the UMWA stated its belief that the mines had not been closed in "bad faith" and that they had in fact "been shut down for legitimate economic reasons." (J.A. 861.)

On September 28, 1998, Apogee and Resources Development LLC (RDL) entered into an **asset purchase agreement** under which Apogee agreed to sell its mining permits, equipment, and rights to mine coal under its lease with Ark Land to RDL in return for $15 million. Pursuant to this agreement, Apogee delivered to RDL at closing a document terminating its lease with Ark Land. In September 1998, after receiving bids from several interested parties, Ark Land entered into a lease of the coal reserves with RDL. **Neither Apogee nor Ark Land required RDL to assume any obligations under Article I of the NBCWA**."

Then on pages 5 and 6:

"**The plain meaning of the term "operations" in Article I of the NBCWA is unequivocal**. According to Black's Law Dictionary, **operation denotes "the process of operating or mode of action; . . . action; activity**." Black's Law Dictionary 1092 (6th ed. 1990). Although this court has not previously considered this issue, **this understanding of the term has been confirmed by other courts**. "**Federal courts have consistently held that the successorship clause applies only to the sale of an active coal mine**." *UMWA v. Sewell Coal Co.*, C.A. No. 2:92-0432, at 5 (S.D.W.Va. July 9, 1993) (granting summary judgment to defendant employer as a matter of law).

For example, in *UMWA Dist, 6 v. North American Coal Corp.,* C.A. No. C-2-79-242, at 6 (S.D. Ohio Mar. 21, 1980), the court held that the sale of a coal preparation plant that had been closed for fourteen months did not constitute a transfer of "**operations**" as contemplated by Article I of the NBCWA and granted summary judgment in favor of the defendant employer. The court noted that the coal preparation plant "lay still for three months until March 1, 1978 at which time North American announced its intention to close the mine for good. There is no suggestion that the closing was made in bad faith." *Id.* Similarly, **in *UMWA, International Union v. U.S. Steel Mining Co.,*** 636 F. Supp. 151, 153-54 (D. Utah 1986), *aff'd,* 895 F.2d 698 (10th Cir. 1990), **the court held that as a matter of law, a mining "operation," for purposes of Article I of the 1984 NBCWA, refers to a mine site or facility where active coal mining operations are being conducted. That is, an "operation" connotes a mine that is actively producing coal and operating as a coal mine. Thus, a mine that has ceased to function as an active coal mine is not an "operation,"** assuming the mine was closed in good faith."

* * * * *

"In light of the language of the agreement and these authorities, the district court correctly concluded that "[**t]he term operations** in Article I connotes actively producing mines and **does not include closed mines in good faith for economic reasons**." Moreover, since the undisputed facts of this case indicate that no "**operations**" were transferred, summary judgment was appropriate. . . ."

Then on page 8:

"Moreover, the fact that the language of the successorship clause in Article I of the NBCWA has not been altered since 1974 serves to confirm the lack of ambiguity as to the meaning of the terms "**operations**." "It should be noted that [a]ll collective bargaining agreements between BCOA and the UMWA are not conceived in a vacuum; each side has lawyers scrutinizing every word in light of old interpretations." *BethEnergy Mines,* 714 F. Supp. at 263 (E.D. Ky. 1988) (quotation omitted). As previously discussed, courts have analyzed the meaning of the term "operations" in the successorship clause on numerous occasions and have interpreted the term consistently. "If these interpretations did not accord with the parties' understanding of their contract, they had ample opportunity to make their own understanding explicit. Failure to do so strongly suggests the parties incorporated the courts' interpretation of the agreements." *Carbon Fuel Co. v. UMWA,* 444 U.S. 212, 222 (1979). **Here, the fact that the language of the successorship clause has remained unchanged since 1974 is compelling evidence that prior courts' determinations and the term "operations" refers to active mines and not to mines closed in good faith for economic reasons was consistent with the intent of the parties.** Limited consideration of extrinsic evidence in this manner does not foreclose summary judgment. . . ."

Finally on page 9:

> "For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of defendants-appellees." (emphasis added)

It should be obvious to the Arbitrator by this point that the decision in the instant dispute must be consistent with, what Arbitrator Beckman described as, "settled law". (See our Exhibit #34) If the Arbitrator somehow concludes that, in spite of what has been argued to this point, that she should consider the details of the contracting out issue, and the provisions of Article 1A, Section (g), paragraph (2), we offer the arguments in this next Part II.

## PART II
### THE PROVISIONS IN ARTICLE 1A, SECTIONS (a), (G) OR (I) HAVE NO APPLICATION AT THIS CLOSED NON-PRODUCING FACILITY

We first want to recognize two of your earlier decisions that we have reviewed to try to get an understanding of your experience with provisions of the NBCWA. We have placed copies of these two decisions under **Tab "F"** of our Evidence Exhibits Binder. Your 1995 decision makes it clear to us that you fully understand the application of the provisions in Article 1A (g)(2). Your 1996 decision is convincing that a past practice cannot continue to have a binding effect after the basis underlying the practice changes, such as the complete and permanent cessation of all "production of coal".

We have selected a sampling of on-point decisions deciding work jurisdiction issues at Mine that had completely ceased all production of coal. Many of the decisions were with companies for whom I work. As such, I was the Advocate for the Employers in many of the decisions. The first two decisions are examples. The first is a panel decision by a new-to-the-industry Arbitrator who rejected claims to closure work at a closed mine. Having been the Advocate before Arbitrator Kauffman, I know that she was presented arguments and support decisions that are parallel with those being presented to you. *(The same is true for Exhibit #3 by Arbitrator Oliver.*

Exhibit #12:  **D-20041AG-4**
     Arbitrator Nancy Kauffman in <u>Colony Bay  Coal Company and UMWA, District 17, Local Union 9177</u>, decided June 14, 2004.

See pages 18, 19 and 20:

> "1.    <u>Does the closing of a mine affect work jurisdiction</u> as well as local customs and practices?
>
> <u>Several courts support management's contention that the closing of a mine changes the underlying circumstances in local customs and practices</u>: Bankruptcy courts of Colorado 2/15/89, U.S. Court of Appeals 2nd Circuit 12/12/89, U.S. Court of Appeals 10th Circuit 01/01/00, and U.S. Court of Appeals 6th Circuit 06/05/03.
>
> <u>In addition, numerous arbitrators have reached the same conclusion</u>. Hewitt 04/02/81, Lawrence 05/25/83, Stoltenberg 06/24/83, Sinicropi 06/10/85, Dissen 05/21/87, Suster 10/30/87, 0[sic] Hayford 05/19/88, Judah 10/17/88, Nicholas 11/15/88, Davies 09/07/89, Hill (cited in Wendt 01/06/01) and Feldman 07/23/00. <u>Therefore, the answer is yes</u> . . ."

* * * * *

"5.    The union argued that the issue in this case had been decided before and that res judicata applies.  Are there any citations that meet the criteria of res judicata for this case?

ARB 78-24 explains that res judicata provides for the 'corollary needs for finality of decision and stability of labor-management relations' and is applied where certain criteria are met:

(1) the same parties bring (2) the same contractual issues (3) based on the same set of facts and circumstances, and (4) the same issues of contract interpretation/application.

Therefore, in order for res judicata to apply to the issue in this case, the prior decisions must be between UMW Local 9177 and Colony Bay (same parties), **after the mine closed in late 1995** (same circumstances), and refer to maintenance of ditches (same contract issue) that are not on Colony Bay property or to that specific ditch (same fact circumstances).

Many of the citations offered are distinguished from the instant case because they do not meet the criteria. They either refer to other parties or do not refer to a closed mine or to ditch maintenance. **The only citation which seems relevant for res judicata is Charnock,** which preserves a settlement reached by the parties that, according to the unrefuted testimony of witness Kincaid, refers to an area that is geographically relevant to the ditch in question. **The parties agreed that Colony Bay classified employees would, among other things, maintain ditches in this area even though it is not on Colony Bay property.**

**Although the courts have determined that rights, benefits, customs, and practices gained at an active mine do not survive the mine closing,** any **agreements signed after October 31, 1995 (when the mine was closed) between Local 9177 and Colony Bay must be honored by both parties.**

**The prior decisions provided by the advocates clearly show that practices that were customary while the mine was in operation do not survive a mine closing, since the underlying circumstance that gave rise to the practice (actively producing coal) no longer exists.** However, practices which are agreed to in written settlements signed after a mine has closed do provide one basis for establishing past practice which are incorporated into the Agreement in Article XXVI section (b) where they do not conflict with the Agreement.

**In this case, the parties agreed on March 28, 2000 that, among other things, work on the ditches in the vicinity of the road to Winifrede 13 and 14 and to Colony Bay, although not on Colony Bay property, belongs to active Colony Bay**

**employees**. **This settlement was signed well after the mine closed** (as was the earlier settlement on May 14, 1999, which refers only to Colony Bay property). By the terms of res judicata, it is clear that the same parties (Colony Bay and Local 9177) brought the same issue (who is to maintain the ditches in the region covered by the March 2000 settlement) under the same circumstance (Colony Bay is a closed mine) and the same facts (work group other than classified employees of Local 9177 did the work) and there was no cause for exception because the classified employees of Local 9177 were available and had the necessary skills and equipment and the work was not under warranty (the requirements of Article IA(g)). The work in question was within the jurisdiction of the classified employees but was not offered to them so that classified employees lost an opportunity to earn two days work at premium rate but for the violation of the settlement. Although management advocated that the March 2000 settlement did not relate to this case, they did not meet the clear and convincing burden established in ARB 78-14." (emphasis added)

Arbitrator Kauffman held that were it not for the settlement agreement between the Parties, after closure, the contract would not otherwise apply after cessation of production. In other words, by the settlement agreement, the Employer agreed to provide certain jurisdiction over work that was otherwise not protected by the NBCWA after cessation of production. We now turn to another on-point decision at the same permanently closed Mine involved in the just-cited decision by Arbitrator Kauffman. Former Administrative Law Judge Oliver was confronted with a claim of improperly contracting out the repair of brakes on a water truck, at a permanently closed surface mine. Arbitrator Oliver very clearly interprets the NBCWA to exclude all work except "rough grading in reclamation" at a permanently closed mine.

<u>Exhibit #13</u>:  **D-20041AA-4**
    Arbitrator Garvin L. Oliver in <u>Colony Bay Coal Company and UMWA Local Union 9177, District 17</u>, decided August 11, 2004.

See page 3:

>"Colony Bay is a signatory to the NBCWA.  Over the years, Colony Bay has operated one surface mine on its property.  **The mine was shut down in 1995 and reopened in 1999.  It produced coal from a high wall miner for a temporary period ending in approximately January 2003** 2/."

>"2/ I take official notice that in Case No. 02-17-04-123, page three, decided April 10, 2004, involving these same parties, it is stated that Colony Bay "did produce coal from a high wall miner for a temporary period ending in approximately January 2003" and on page eight it is stated that "Fred Conner, Director of Peabody Conservancy and responsible for the reclamation of the Company surface mine, testified that Colony Bay is not a producing coal mine and has not been since January 2003 when the mine went to a full reclamation mode."  His testimony to that effect was credited on page ten of that decision."

Then on page 6:

>**"Colony Bay Contentions**
>
>The Company contends that because the Colony Bay Surface Mine is no longer engaged in the production of coal its employees do not have jurisdiction of any work at all pursuant to Article IA, Section (a) except that in Article 1A, Section (g) (3) "rough grading in reclamation," the work in which they were currently engaged.  The Company claims that even if Colony Bay employees had by past practice and custom gained jurisdiction, past practice and custom cannot survive the change of conditions underlying the practice or custom, especially when the change is the cessation of production of coal.  Accordingly, the Company argues that the only remaining jurisdiction is that set forth in a post-closing settlement discussed in the decision of Arbitrator Nancy Kauffman in Colony Bay Co and UMWA District 17, Local Union 9177, decided June 14, 2004 which also governs this decision under the doctrine of *res judicata.*"

Then on pages 8 and 9:

>"**Unfortunately for the Union, Colony Bay has provided extensive court and arbitrator support, including that of Arbitrator Kauffman, for the proposition that because the Colony Bay Surface Mine is no longer engaged in the production of coal its employees do not have jurisdiction of any work at all pursuant to Article IA, Section (a) except that in Article IA, Section (g) (3) "rough grading in reclamation**," the work in which they are current engaged.  The Company has also provided extensive support for the view that past practice and custom cannot survive the change of conditions underlying the practice or custom,

especially when the change is the cessation of production of coal.  **The Union has provided no specific agreement, as it did in the Kauffman decision, which might override these principles**.

In Eastern Associated Coal Corporation/Peabody Coal Company and UMW, District 17, Local 9177, Case No. 88-17-89-304 (Arbitrator Klein, June 16, 1989), provided by the Union, Arbitrator Klein held that the employer violated the Agreement when it contracted out the remodeling of a closed shop where coal was not produced.  Arbitrator Klein held that since repair and maintenance work is mentioned separately from the production of coal in Article IA, Section (a), it must be considered separately in resolving the dispute.  He noted that the contested work was not entirely unrelated to past or future coal production as the remodeling was intended to create a warehouse for parts and equipment related to the mining of coal.

**Arbitrator Klein's opinion is against the weight of authority provided by Colony Bay**.  Also he does not deal with the fact that the repair and maintenance work referred to in Article IA, Section (a) and Section (g) (2) is to be performed "at the mine or central shop" **which in context with the other provisions of the Agreement would indicate an active operation or mine**.  Further in this case, there is no indication that the work is related to past or future coal production.

**Here the truck is admittedly used in the reclamation process and must be appropriately maintained by mechanics for that purpose**.  However, **the specific provision that "The Employer may not contract out the rough grading in mine reclamation work" implies that all other reclamation work may be contracted out under the contract interpretation phrase "expression unius est exclusio alterius", meaning that the mention, expression, or inclusion of one thing implies the exclusion of a like thing not mentioned, expressed or included**.  Consolidation Coal Company, Burning Stat (sic) No. 4 Mine and UMWA Local 1825, District 12 (Arbitrator Wendt, January 6, 2001)."   (emphasis added)

The last quoted paragraph is an interpretation of contract language that is consistent with standards applied uniformly by Arbitrators.  For example, in one of your decisions in 1999, you stated:

"The Union has the burden of persuasion in this contract interpretation/enforcement action.  In such cases it is the Arbitrator's primary obligation to determine whether the language in the relevant Agreement provisions is **clear and unambiguous**.  If so, that language must be applied according to the its plain meaning, even if one party finds the result somehow harsh.  **In order to give force and effect to the entire Agreement, it is a well accepted principle of labor arbitration that applicable or related contract provisions must be read together in harmony as a whole**."

(emphasis added)   (Bowers in Tanoma Mining Company and UMWA Local Union 24 29, decided February 19, 2099, page 13)

We contend that Arbitrator Oliver's application of the contract interpretation principle of **"expression unius est exclusio alterius"** applies to the instant dispute. The Courts cited earlier had no problems finding that the word "operation" is a term of art and is entitled to such treatment. We respectfully submit that when the production, processing and transportation of coal ceases, the jurisdiction over work which is defined in Article IA, Section (a), Section (g)(1) & (2), and Section (i) ends. Likewise, as you found in your 1996 decision at Rend Lake[1], any claimed past practices, local agreements or grievance settlements, as well as any arbitration decisions rendered during a period when the Mine was a **producing mine** no longer have any application. There have been a multitude of mainstream coal industry Arbitrators who have ruled in that manner. We will cite a sampling of them next. The next decision by veteran Arbitrator Harrison is directly on-point as illustrated by the following statement by him:

> *"....**It appears to this Arbitrator that the fact that this mine is not operational is the very crux of this case. The major applicable provisions in this instance are in Article IA** and in **Sections (a)**, Work Jurisdiction; **Section (b)**, Exemption Clause, **and Section (c)**, Supervisors Shall Not Perform Classified Work. **All of these provisions contemplate an operating, producing coal mine**."* (emphasis added)

The exact same thing can be said in the Grievance that is before you for hearing

and decision. The crux of the matter is that the Powhatan No. 6 Mine permanently

ceased all production on October 16, 2017, and all milestones have been met to result

in another **permanently closed Mine**, and the end of an era, so to speak.

Exhibit #14:   **D-811AA-20:.**
Arbitrator Allen J. Harrison  in Old Ben Coal Company and UMWA Local Union 1487, District 12, decided March 26, 1981.

---

[1] Decision by Arbitrator Mollie H. Bowers, in Consol, Rend Lake Mine and UMWA District 12, Local Union 1545, decided March 2, 1996.  (Copy under **Tab "G"**)

See pages 4 and 5:

> "**The Company's primary contentions, however, are that this mine is closed, no production work is being done and hence no past practice is applicable.**  Moreover, the Company points out that the only work it is doing is that which is required by law under the circumstances of a closed mine.

DISCUSSION

The Arbitrator would note that all of the decisions submitted to him provide very little guidance since none of them deal with a mine that has been closed.

**It appears to this Arbitrator that the fact that this mine is not operational is the very crux of this case.  The major applicable provisions in this instance are in Article IA** and in **Sections (a)**, Work Jurisdiction; Section (b), Exemption Clause, **and Section (c)**, Supervisors Shall Not Perform Classified Work.  **All of these provisions contemplate an operating, producing coal mine**.

In Section (a), Work Jurisdiction, the pertinent language on this point states:

> "The production of coal, including removal of overburden and coal waste, preparation, processing and cleaning of coal. . . , repair and maintenance work normally performed at the mine site or at a central shop of the Employer and maintenance of gob piles and mine roads, and work customarily related to all of the above shall be performed by classified Employees. . . ."  (Arbitrator's emphasis)

Note then that the Union's Work Jurisdiction is premised on the first four words, "**The production of coal**."  "**The production of coal**" is then defined to include all the other related activities to such production.

Again, the concept of an operating mine is imbedded in Section (b), Exemption Clause, which states in relevant part:

> ". . . . to effectively conduct the safe and efficient operation of the mines. . . ." (1st paragraph)

> ". . . and who perform no production work" (3rd paragraph)

> ". . . more men than are necessary for the safe and efficient operation of the mine" (5th paragraph) (Arbitrator's emphasis)

Thus when one comes to Section (c), Supervisors Shall Not Perform Classified Work, one recognizes that this is in the context of an operating mine, producing coal.

> **Moreover, the Union's claim of past practice and customary work is strongly negated by the fact that there is no custom or past practice with regard to a** closed **mine since this had not previously occurred at this mine site.**"

(Underlining only by Arbitrator)<br>
(Emphasis added)

When applying Arbitrator Harrison's conclusions concerning previous application of Article IA, Section (a) and/or past practices to the now permanently closed and abandoned Powhatan No. 6 Mine situation, it is clear that any past practices emanating out of the previously coal producing mine may be unilaterally discontinued.

The next decision relies on the writings of five (5) other mainstream coal industry Arbitrators who reached similar conclusions. It should be noted that the Burning Star #4 Mine was a very large surface coal mine in Illinois prior to its complete cessation of production.

Exhibit #15:   **D-20011AA-1**
    Arbitrator Ann C. Wendt  in Consolidation Coal Company, Burning Star No. 4 Mine and  UMWA Local Union 1825, District 12, decided January 6, 2001.

Pages 15, 16 and 17:

> "**The record reveals that the instant dispute does not involve the production of coal. Coal mining ceased in September 1997. Since that time, the Mine has been in reclamation**. **Article IA (a)** averred by the Union to be an applicable section of the NBCWA **pertains to the production of coal. Following are conclusions of prior Arbitrators**.
Arbitrator Michael LeRoy concluded:

> "**But the work done by the contractor here was not related to coal production within the meaning of Article I, section II (a)**. The purpose in moving the power line was not to permit mining under the roadbed of old Route 13. Instead, it was to bring the power line up to new Route 13, where CIPS could readily service

it. Even if coal was not located under old Route 13, I am certain that the power line would have been relocated in the same manner that it was in this case." (Case No. 93-12-96-08, Dated 03/17/96, Michael H. LeRoy, page 9)

Arbitrator Sherwood Malamud stated:

"Again, assuming arguendo that the separation, stacking and loading of slurry pipe repair and maintenance work, the Arbitrator is unable to establish whether the work in question is of the type customarily performed by classified employees at the mine. **Such a finding might be the basis for further analysis as to whether the disputed work falls within the work jurisdiction of the Union when coal is not produced and the mine is in reclamation**." (Case No. 88-12-90-284, Dated 08/31/90, Sherwood Malamud, page 7)

Arbitrator David T. Kennedy provided the following:

"It is significant, I think, that Section (g) (1) and both paragraphs of Section (i) use the words 'prior practice and custom' and Section (g) (2) speaks of 'work customarily performed by classified employees'. **On the other hand, section (g) (3), which covers reclamation, states only that the employer may not contract out the rough grading. There is a phrase used frequently in contract interpretation, expressio unius est exclusio alterius, which means that the mention, expression, or inclusion of one thing implies the exclusion of a like thing not mentioned, expressed or included.** Applying this to the section involved, **the express inclusion of rough grading in reclamation and its assignment to classified employees of the Company implies that all other reclamation work be contracted out**.

An observation often made in the interpretation of collective bargaining agreements is that the Company is vested with all the usual powers of an employer (i.e., hiring and firing, work assignments, etc.) except as those rights are altered or restricted by the labor contract. **Using that approach in this case, the only part of reclamation work which the Company may not contract out is rough grading**." (Case No. 81-17-81-610, Dated 10/30/81, David T. Kennedy, page 6)

Arbitrator Paul F. Gerhart stated:

"The arbitrator has given considerable thought to the question of whether the more general language of Article IA (a) might reasonably be applied. **The relevant language states, after enumerating a list of activities related to the production of coal 'and work of the type customarily related to all of the above' shall be performed by classified employees. On first impression, it appears arguable that hauling dirt to cover a gob pile during the reclamation process is a type of work related to coal production**.

     **For at least two reasons enumerated by other arbitrators before me, however, this argument must fail. First, the parties have explicitly provided that only "rough grading" in mine reclamation work is exclusively within the province of the Union's jurisdiction. As Arbitrator Roberts noted, based on the principle of expressio unius est exclusio alterius, to express one is to exclude others, the Company implicitly retains the prerogative to contract out other aspects of mine reclamation work.** Even if the Company chose to have bargaining unit employees perform certain work related to reclamation as a way of doing business, even for an extended period, **no clear and binding past practice can necessarily be claimed. Only where the criteria specified by Arbitrator Selby in ARB 78-2 have been proven by the Union is a binding practice enforceable. That was not done here.**" (Case No. 93-12-95-77, Dated 03/12/96, Paul F. Gerhart, page 17)

Chief Umpire Thomas M. Phelan stated:

     "**The only rights which the grievants here arguably had were those based upon past practice, but since the practice would not apply to the different factual situation in this case, their claim that their contractual rights under Article IA and XXVI of the Wage Agreement were violated must consequently be denied** . . ." (Case No. 93-11-97-228P, Dated 08/21/98, Thomas M. Phelan, page 14)

     **The Record supports a conclusion that the Employer did not violate Article IA (a) of the NBCWA**." (emphasis added)

The next decision by another mainstream coal industry Arbitrator is at a closed operation of Peabody in Illinois.  The Arbitrator clearly supports our position that any prior practice developed while the Powhatan #6 Mine was a producing mine goes away after production ceases.

Exhibit #16:    **D-20001AA-6**
Arbitrator Marvin J. Feldman in Peabody Coal Company, Randolph Preparation Plant and UMWA, Local Union 1148, District 12, decided July 23, 2000.

See page 7:

"<u>A past practice is established under a set of circumstances</u>. <u>Once that set of circumstances is done away with then in that event the practice is concluded for the period of time that the underlying predicate for the practice is no longer in use</u>. In this particular case, it is noted in the record that the mine was shut down, it did not produce coal. The preparation plant was closed, the mines that fed the preparation plant were also closed. <u>There were seven people on duty at Randolph for the mere purpose of closing down the facility and doing some reclamation work and securing the mine</u>. There was no work accomplished in the production of coal or in the cleaning of coal either at the mine at which Randolph was located, or at Randolph itself. <u>Simply put</u>, <u>the basis for the practice in this particular case was concluded when the mine was shut</u>. <u>The practice, therefore, was not made when the mine was shut down  but was made when the mine was operating and when the preparation plant was operating</u>. Absent that, the union while they may claim a practice does not have a practice under the conditions and circumstances involved in this particular matter."  (emphasis added)

The next decision by Arbitrator Hewitt held that a practice concerning firebossing at this underground coal mine, while it was a producing Mine, could not survive after the Mine permanently ceased producing coal.  The same is true as to any work jurisdiction issue in the absence of "production" of coal at the now permanently closed and sealed Powhatan No. 6 Mine.

<u>Exhibit #17</u>:   **D-8226B-5**
Arbitrator Thomas L. Hewitt in <u>Buffalo Mining Company, Lyburn, West Virginia and UMWA Local Union 8454, District 17</u>, decided April 2, 1982.

On pages 5, 6 and 7:

"There is no question that while coal was being produced that he inspected the air intakes, escape ways, roof, etc. and did other necessary firebossing from the end of the belt to the face even though such face may have been pre-shifted and otherwise firebossed by supervisors during actual coal production. This grievant fireboss clearly filled out the fire boss reports and performed firebossing duties for approximately three (3) hours per day. The balance of his time was spent doing other miscellaneous assignments at the mine. During the other two shifts, the section foremen did the firebossing.  To this point the case is not unique.

**I believe there is no question, and I believe the employer would probably agree that had 9-A Mine continued in operation without some significant change bearing on the character and scope of the job of fireboss, the employer could not defend an action of replacing the grievant fireboss with a supervisor fireboss for to do so would be clearly violative of Article XXVI, Section (b).** But the question of who should be assigned as fireboss, had the mine continued to operate, is not our case here and does not square with the facts presented to me at the Oral Hearing which I have gone to some lengths in detailing under the Statement of Facts. Nor are we faced with the problem of seeking guidance as to whether the work now being performed is inherently classified work or inherently supervisory work because it is freely admitted by both parties that a classified employee performed firebossing on one turn and exempt employees did it on the other two turns. Thus, **the issue in the case centers on whether the employer must retain and assign its only classified fireboss, who was employed in that capacity from March 26, 1979 to December 19, 1981 because of the practice of having a classified fireboss.**

**There can be no serious dispute that the conditions in effect and the conditions under which the grievant worked while the mine was operating were not present after December 19. The mine was no longer producing coal which in itself would have changed some of the atmospheric surroundings; and although some firebossing is required during recovery, it is not as extensive as that required during operations and the time spent is substantially reduced.** The employer's action of discontinuing production in fact left very little work which the grievant could have performed because the majority requirements of the fireboss job the grievant performed prior to December 19, 1981 were not required thereafter. **In short, (and as has long been established as an arbitration principle) when a significant change occurs in the conditions or the underlying basis upon which a practice was established, the practice need no longer be given weight.** To state the analysis of this case in a most succinct fashion, the performance of recovery work in a shut-down operation, and the conditions under which it is performed, is different from the performance of idle day work, maintenance work or production work and the conditions under which those activities are performed. **Accordingly, since it is different, and unrelated to pre December 19, 1981 conditions, the employer could then assign firebossing during recovery as it saw fit and it chose to give that responsibility to a qualified exempt employee rather than a qualified classified employee.** That choice was not in violation of the Wage Agreement or any established arbitration guideline. (emphasis added)

As evidenced by the above decisions, a change in the circumstances which gave rise to a practice or method of consistently accomplishing an operation, task or particular work assignment, negates the necessity of continuing to have it

accomplished in the manner dictated by the practice. Furthermore, grievance settlements and local agreements are also subject to a continuation of the circumstances which first gave them meaning and purpose.

The next decision also involves the predicate underlying the grievance settlement concerning dispatchers changing thus nullifying the settlement.

<u>Exhibit #18</u>:   **D-8726B-21**
Arbitrator David T. Kennedy in <u>Consolidation Coal Company, Franklin No. 125 Mine and UMWA Local Union 1360, District 6</u>, decided December 10, 1987.

See page 2:

"As a result of the grievance, an agreement was entered into on May 23, 1978, as follows:

'Management agrees to settle this grievance in the following manner: A DISPATCHER WILL BE ASSIGNED TO WORK WHEN THERE ARE TEN (10) U.M.W.A. REPRESENTED EMPLOYEES WORKING IN THE MINE, OR WHEN STONE IS BEING LOADED AND HAULAGE IS INVOLVED, OR WHEN EQUIPMENT IS BEING MOVED.'"

Then on pages 11and 12:

"Section (h)  Finality of Decision or Settlement

Settlements reached at any step of the grievance procedure shall be final and binding on both parties and shall not be subject to further proceedings under this Article except by mutual agreement. Settlements reached at steps 2 and 3 shall be in writing and signed by appropriate representatives of the Union and the Employer." Article XXIII--SETTLEMENT OF DISPUTES

The 1978 Agreement makes a prima facie case for the Union's position, and **<u>the burden is upon the Company to show a substantial change in the circumstances which gave rise to the settlement</u>**. Therefore, a close comparison of the 1978 and 1987 conditions is required.

> **In 1978 there were 580 employees at the mine**. **There are now 50**. **In 1978 there were 13 active sections with up to 12 crews per shift**. **There is now only one section per shift in operation, with two shifts operating instead of three**. **However, the principal difference is that in 1978 all coal was hauled out in 40 car trips with two haulage crews on each shift**. **Stone and supplies were also hauled by motor**. **In 1987 there is no coal haulage; all the coal is moved from the mines by belt**. **Some stone and supplies are still hauled by rail, and this constitutes the only rail haulage.**

> The principal duties of a dispatcher, as the name implies, is the control of traffic. **In Joint Interpretative Bulletin No. 6, executed on January 27, 1972, there is reference to this dispatcher as one "whose primary duties relate to the underground transportation of a deep mine**."

> **In the Franklin 125 Mine, as presently operated, there is practically no rail traffic to control, and less than one-tenth as many employees as at the time the settlement was made**. The evidence adduced at the hearing, including maps which were examined by the Arbitrator, showed that in 1978 the operating mine covered an extensive area with thousands of feet of tracks, two portals, and many mine cars being moved in an intricate manner to haul coal from 13 active sections. None of this coal haulage is now done by motors and mine cars, and the working area is but a fraction of what it was formerly. **There is no comparison which can make the former agreement applicable to the present circumstances**." (emphasis added)

Thus, it can be seen that even otherwise binding local agreements can and must be modified or vacated if the circumstances under which they arose have changed. Likewise, applicability of the 2016 CWA is also reduced to only those provisions which continue to apply, if any, once the production of coal has been permanently terminated. Therefore, at the now closed Powhatan No. 6 Mine the only work jurisdiction provision that continues to be applicable is it applies solely to the "**rough grading**" portion of mine reclamation work.

The next decision involves a closed underground mine where the Employer

decided it had no contractual obligation to retain classified employees to retrieve

equipment from the mine.

Exhibit #19:    **D-831AA-62**
    Arbitrator Walter E. Lawrence in <u>Western Slope Carbon, Inc., and UMWA</u>
<u>Local Union 6417, District 15</u>, decided May 25, 1983.

See page 6:

> "In order to minimize the monetary losses, the Company decided that it would
> strip the mine of all salvageable parts and equipment. These items would be stored
> in an area of the mine and put up for sale.
>
> The Union met with the Company on several occasions to try to work out
> some arrangement to keep as many bargaining unit employees as possible employed
> to do the necessary work. **The Company, however, decided that it had no**
> **contractual obligation to have the work performed by the Union employees**. It
> therefore laid off the 168 bargaining unit employees on December 13, 1982 and
> subsequently had the remaining supervisory employees do the work."

Then on pages 7 and 8:

> "**In the instant case**, **the Union argues that, under the circumstances of**
> **this case, the contract does obligate the Company to retain bargaining unit**
> **employees to do the work in question**. It takes the position that bargaining unit
> employees installed the mining equipment and therefore they should have the right
> to remove it because it is work that they normally perform.
>
> **The Company argues that since it no longer is in the business to produce**
> **coal and the mine was permanently taken out of a production mode, the work**
> **being performed is simply warehousing and not covered by the Agreement**.
>
> Both parties rely primarily on Article IA of the Agreement to support their
> positions. The Arbitrator also agrees that Article IA is controlling. In his considered
> opinion the Union's position must be rejected. **The contract does not provide**
> **protections against the loss of work opportunity occasioned by a permanent**
> **curtailment of the mining operations. The work jurisdiction covers only that**
> **work which leads to the production of coal or the repair and maintenance of the**

**mine and mine property while the mine is in operation to produce coal**. In the instant case, the Company had clearly gone out of the business of producing coal and the work that was subsequently done was solely for the purpose of salvaging and selling the equipment, materials and supplies.

These statements signal the Arbitrator's conclusion as to the proper meaning and effect of Article IA. **In other words, the point at which the Company curtailed its mining operation and went out of the business to produce coal also became the point in time that the bargaining unit ceased to exist. The work in question was not covered by the labor agreement and therefore the Company was not contractually required to have the Union employees do it.**" (emphasis added)

This Arbitrator clearly found that Article IA, Section (a) is controlling, and that it covers only that work which leads to the production of coal, and that removing parts and equipment from the mine for the purpose of salvaging and selling the equipment, materials and supplies did not come within the Union's work jurisdiction.

We now turn to the decision of another mainstream coal industry Arbitrator, who writes a decision that nearly parallels the circumstances involved in the instant matter.

Exhibit #20:   **D-831AA-40**
Arbitrator Carl F. Stoltenberg in <u>Clinchfield Coal Company and UMWA Local Union 1477, District 28</u>, decided June 24, 1983.

On page 6:

"<u>Factual Background</u>
Clinchfield Coal Company (Company) operated the Chaney Creek Mine until it was closed on May 22, 1982. Employees at the Mine were represented by Local Union 1477 of the United Mine Workers of America, District 28 (Union). In addition to the employee at the Mine, Local 1477 represented employees at the tipple handling coal from the Mine. The Company also operates the Wilder Mine and employees there are represented by the Union's Local 1965.

Since 1974 coal from the Wilder Mine was stockpiled at the Chaney Creek Mine tipple, along with Chaney Creek Mine coal.  Coal from both Mines were blended there for improvement of the Chaney Creek coal and taken to the Preparation Plant serving the Mine.  **Local 1477 members handled all aspects of the tipple's operation and maintenance until the Chaney Creek Mine's closing**."

Then on page 7:

"Union Contentions

      **The Union contends that any work performed at the tipple is within the jurisdiction of Local 1477 and that the Company has improperly assigned work there to members of Local 1965**. . . .

Company Contentions

      **The Company contends that it has closed Chaney Creek Mine and that it has transferred the tipple's job function to the Wilder Mine**.  **It stresses that the closing is permanent and that it will not reopen the Mine**. . . .

      **It points out that while a past practice of Local 1477 members operating the tipple existed, it cites the closing of Chaney Creek Mine as a sufficient change of condition to set aside the practice**...."

Then on page 8:

". . . **The closing of the Mine, with the paneling of its employees, constitutes a major change in the conditions which had existed at the tipple and justifies a change in the past practice**. . . ."

Finally on page 9:

"**For all practical purposes, Chaney Creek Mine no longer exists**.  **The Company has transferred the job functions of the Chaney Creek tipple to the Wilder Mine**.  In effect, the work jurisdiction of Local 1477 ceased at the tipple with the closing of the Mine and the completion of the recovery process.  **For these reasons, the Company is no longer required to have only members of Local 1477 operate and maintain the tipple**.  **The tipple now is an integral part of the Wilder Mine, and its work jurisdiction falls to Local 1965**."  (emphasis added)

Applying the decision by Arbitrator Stoltenberg to the circumstances at the permanently closed Powhatan No. 6 Mine, one must again conclude that since all production has ceased and the Mine has been permanently closed, all past practices created during a time of production must be rendered non-existent. As a result, any work (other than the rough grading portion of reclamation) has nothing to do with coal production. The same principles are supported by our next exhibit.

Exhibit #21:   **D-851AA-58**
Arbitrator David L. Beckman in <u>Amax Coal Company and UMWA Local Union 1015, District 11</u>, decided January 4, 1985.

See page 8:

> "**It is evident that the Wright Mine has no past practice or custom relating to the sale of its mining equipment upon its shutdown. There has never been a permanent shutdown at the Wright Mine. Accordingly, there is no reasonable basis for applying Article XXVI, Section (b) in this case**.
>
> The position of the Union under Article IA is based on its view that the dismantling in question is repair and maintenance work. In my judgment the evidence does not support such a view. Dismantling work may constitute repair and maintenance work under some circumstances. **However, where the mine is permanently closed and the dismantling in no way aids the production, preparation, processing, cleaning or transportation of coal at the mine, there is good reason to believe that the dismantling work may fall into some category other than repair and maintenance**. I hold that the provisions of Article IA were not designed to prohibit or retard sales of used mining equipment upon the permanent closure of the mine." (emphasis added)

Our next citation was written by veteran coal industry Arbitrator Sinicropi. In the decision, at the time in question, the mine had been permanently closed, and thus all of the work [except for rough grading] had been removed from the jurisdiction of classified employees.

<u>Exhibit #22</u>:   **D-851AA-18**

    Arbitrator Anthony V. Sinicropi in <u>Old Ben Coal Company and UMWA Local Union 2309, District 12</u>, decided June 10, 1985.

See page 5:

    ". . . Simply put, the present case involves the issue whether the challenged work is classified <u>even though the mine has been permanently closed</u>."

Then on page 6:

    "The record also demonstrates that when the mine was operational (not permanently closed) a Top Maintenance Man performed the duties of the Hoisting Engineer. That work was classified work on production, idle or vacation days and regardless of whether classified employees were underground. <u>Accordingly, the crucial determination in this case is whether work which is classified while the mine is operational maintains that status once the mine has been permanently closed</u>. . . ."

Concluding on page 7:

    ". . . That determination must be based on Article I A (a) and the time the work is performed.

    Despite the Company's acknowledged burden of persuasion in this case, <u>the challenged work must fall within the scope of Article I A (a) in order for the Union to prevail in this case</u>. The determination of whether the challenged work is classified work depends on whether the work of the Hoisting Engineer in this case is customarily related to the production of coal. <u>Article I A (a) establishes the work jurisdiction clause and provides</u>, "<u>The production of coal</u> . . ." <u>shall be the work of classified employees</u>. <u>The contract then lists specific functions that are to be considered "the production of coal."</u> <u>Further, the provision ends with</u>, "<u>. . . and work customarily related to all of the above shall be performed by classified employees</u> . . ." <u>Article I A (a) cannot be read as definitional (all encompassing) but rather as descriptive (exemplary)</u>. Finally, the last paragraph in Article I A (a) provides, "<u>Nothing in this section will be construed to diminish the jurisdiction, express or implied of the United Mine Workers</u>." <u>Accordingly, the parties have negotiated a broad jurisdiction clause</u>.

    <u>Although the work is clearly considered bargaining unit work while the mine was operational</u>, the Company's unequivocal assertions that the mine has been permanently closed remove the work from Article I A (a). The work being

<u>performed by the Company cannot be said to be related to the production of coal when the Company has no intention of producing coal again at that mine</u>. . . ." (emphasis added)

The same principles apply to the now permanently closed Powhatan No. 6

Mine.  The next decision is also instructive in this regard, especially as it relates to

discontinuing of past practices and customs at a closed mine.

<u>Exhibit #23</u>:   **D-871AA-14**
        Arbitrator Richard D. Dissen in <u>Consolidation Coal Company and UMWA Local Union 9909, District 31</u>, decided May 21, 1987.

See pages 3 and 4:

        "<u>UNION POSITION</u>"

                                * * * * *

        "<u>As to the fact of a shutdown, the Union dismisses as "ridiculous" any assertion by management that jurisdiction lines may be disregarded when a mine is inactive</u>.  The Union maintains that arbitral precedent has well established that the situation of a mine being closed, sold, idled, or inactive will not relieve the Employer of its obligations to comply with applicable provisions of the Agreement.

        <u>The Union asserts that exclusive unit jurisdiction over the work in question, if not afforded under Article IA of the Agreement, has certainly been secured through a consistent practice over the years of assigning the work solely to unit members</u>. . . .

                        <u>EMPLOYER POSITION</u>

        The Employer asserts multiple defenses.  It is argued, first, that, historically, exempt salaried employees have checked pumps, substations, and various underground and surface electrical equipment at Mine No. 20. . . ."

Then on page 5:

        "<u>The Employer emphasizes that the mine is closed</u>.  The mine has never before been closed. . . .  <u>To the extent the Union's claim of bargaining unit jurisdiction is based on an alleged past practice, therefore, the claim must be rejected, the Employer maintains.   For, according to the Employer, the conditions giving rise to the practice no longer exist at the mine</u>.

The Employer argues, however, that, since the mine is closed, no production is occurring or is intended to occur in the near future. **Inasmuch as bargaining unit jurisdiction generally attaches to the production of coal, as per the terms of Article IA, Section (a), jurisdiction must cease, the Employer agues, when production ceases**."

Then on pages 10 and 11:

"**The Employer has argued that, even assuming that the work in question might ordinarily be considered bargaining unit work, the unique circumstance of a closed mine ought**, nevertheless, **to relieve management of any obligation to assign a classified employee to the work**. In this case, **the Arbitrator must agree**.

**Prior practice and local custom, including practices governing work jurisdiction, are preserved by the terms of Article XXVI, Section (b) of the Agreement, which provides, in part**: "**Except where abolished by mutual agreement of the parties, all prior practice and custom not in conflict with this Agreement shall be continued....**" **See ARB Decision No. 78-28. Prior practice and binding custom do not, however, survive the demise of the conditions which caused such practice or custom to arise initially and to be continued to be observed by the parties. If the conditions underlying the practice cease to be operative, the practice, too, will cease**.

The underlying condition which enabled the bargaining unit to absorb the inspection duties at issue in the case at hand was the existence of a bargaining unit position that could take on the work as an incidental or adjunct part of the overall workload of the position. The inspection duties consumed only approximately four hours each week and, therefore, would not have involved the greater part or, even, a major part of the customary workload of any position. The Employer stressed time and again at the hearing that the classified employees who normally performed the inspection duties had never, prior to December, 1986, been on layoff. Hence, a position had always existed at the mine to which the inspection duties could be appended. As of December 29, 1986, that was no longer true; **the condition which had enabled the bargaining unit to acquire and maintain jurisdiction over the inspection duties ceased to exist**."

Finally on pages 12, 13 and 14:

"... **The present situation at the mine is one of temporary shutdown: all bargaining unit positions have been eliminated and only one supervisor and clerk remain at the site. It cannot be reasonably concluded that the parties jointly intended or anticipated that the practice of assigning the inspection duties to classified employees would endure under such drastically altered conditions**. The very job to which the duties were appended has ceased to exist. **To sustain the grievance in this case would be to have the tail wag the dog, a**

**practice of assigning ancillary duties to a position would continue even though the position itself – the condition creating the practice – had -- been discontinued."**

\* \* \* \* \*

"The sole case cited by the parties which addressed the effect of a mine closing on jurisdiction acquired through custom and practice, rather than jurisdiction granted under IA (a), is <u>Old Ben Coal Company and UMWA, District 12, Local 1487</u> (Harrison, 1981). In that case, Arbitrator Harrison stated:

> **Moreover, the Union's claim of past practice and customary work is strongly negated by the fact that there is no custom or past practice with regard to a closed mine** sine (sic) this has not previously occurred at this mine site.
>
> **This Arbitrator must agree with Arbitrator Harrison's observation**. . . . **The binding nature of the practice is no broader or more enduring than the circumstances under which it has arisen**. . . ." (Underlining only by Arbitrator, other emphasis added)

In our next Exhibit the Arbitrator relies on the holding by Arbitrator Lawrence

in Western Slope Carbon, Inc. (our <u>Exhibit #19</u>) and concurs with the holdings.

<u>Exhibit #24</u>:   **D-871AC-28**

Arbitrator Ronald Suster in <u>The Youghiogheny and Ohio Coal Company and UMWA Local Union 1304, District 6,</u> decided October 30, 1987.

See pages 7 and 8:

> "Article IA was relied upon by both sides in this case. It contains competing considerations. The Employer's right to manage the mine must be considered in reference with any qualifications that might be contained in the Collective Bargaining Agreement. The Employer clearly retains all the managerial rights not limited by the contract. However, the Employer is also bound by the contract and any limitation to the rights of the Employer that are enumerated therein.
>
> **The Opening (sic) words of Section (A) Work Jurisdiction "The production of coal" are key to the analysis of this case**. The work jurisdiction that is defined in Section (A) is premised on these words. Section (A) also includes related activities in such production.
>
> **Section (B) Exemption Clause also refers to a producing coal mine. It contemplates a mine in operation and uses the word "operation" several times.**

It is then consistent to believe that Section(s) Supervisors Shall Not Perform Classified Work should also be applied to an operating coal mine i.e. one involved in the production of coal.

**The fact that the Youghiogheny and Ohio Coal Company closed this mine with no intentions to ever produce coal again distinguishes this case from those submitted by the Union** and from the testimony of the Union witnesses.....

Exhibit 4, Western Slope Carbon and United Mine Workers of America, involved a fact pattern similar to the instant case.  The mine was closed and the Employer decided to strip the mine of all salvageable parts and equipment.  In the Western Slope case, the union grieved over the fact that the remaining supervisory employees removed the equipment,

I quote the discussion in part:

"The Company argues that since it no longer is in the business to produce coal and the mine was permanently taken out of a production mode, the work being performed is simply warehousing and not covered by the Agreement.

**Both parties rely primarily on Article IA of the Agreement to support their positions.  The Arbitrator also agrees that Article IA is controlling.  In his considered opinion the Union's position must be rejected.  The contract does not provide protections against the loss of work opportunity occasioned by a permanent curtailment of the mining operations.  The work jurisdiction covers only that work which leads to the production of coal or the repair and maintenance of the mine and mine property while the mine is in operation to produce coal.**  In the instant case, the Company had clearly gone out of the business of producing coal and the work that was subsequently done was solely for the purpose of salvaging and selling the equipment, materials and supplies."

The facts in Western Slope are almost identical to this situation. . . .  **This arbitrator agrees with the discussion quoted above and finds that it is applicable to this case**."

\* \* \* \* \*

". . . **However, even if the work might have been classified when the mine was in a production mode, it could not be so treated once the Employer had permanently ceased production of coal**."  (Underlining only by Arbitrator, emphasis added)

In our next citation the Arbitrator also denied the grievance because the disputed work had nothing to do with "the production of coal".

Exhibit #25:   **D-881AA-6**
Arbitrator Carl F. Stoltenberg in Cannelton Industries and UMWA Local Union 8843, District 17, decided February 9, 1988.

See pages 8 and 9:

> ". . . On the matter of the setting of the pump and the laying of the pipe, it must be determined that under the circumstances cited on the record, the contractor did not perform classified work.  **The Agreement defines the Union's work jurisdiction as relating to the production of coal.   The Union's work jurisdiction is extended to removal of overburden, processing, preparation, transportation, repair and maintenance and customarily related work. Central to the definition of the work jurisdiction is the fact that the work must be in some way related to the production of coal.   In the instant matter, the production of coal was not even a remote consideration**."

> * * * * *

> ". . . The pumping process was not related to the production of coal.  It is not disputed that classified employees of the Company set pumps and they also lay pipe. **Their work, however, is related to the production of coal**.  The work in this matter relates to an environmental problem caused by the spilling of PCB.  The EPA feared the migration of the PCB to other locations and ordered that it be contained. **Containment of PCB is not work of the type customarily related to the work jurisdiction of the Union**. . . ."

Then on page 11:

> "Based on all the foregoing, it is found that the Company did not violate the Union's work jurisdiction when it contracted out the containment of the PCB spill, including the setting of a pump and the laying of pipe.  **This work was not related to the production of coal nor is it of the type work customarily related in any way to the production of coal**. . . ."  (emphasis added)

In our next citation the Arbitrator reviews the decision of Arbitrator Sinicropi, also at this Mine, (our Exhibit #22) with approval.

Exhibit #26:   **D-881AA-16**

Arbitrator Stephen L. Hayford in <u>Old Ben Coal Company and UMWA Local Union 2309, District 12</u>, decided May 19, 1988.

See pages 11 and 12:

> "Article IA, Section (c) of the 1984 National Agreement unequivocally bars supervisors from performing "classified work covered by this Agreement."..."

* * * * *

> "<u>Undoubtedly</u>, <u>when the Mine was producing coal and at all times before it was permanently closed, the work of dismantling and removing mining equipment from underground and transporting it about on the surface was within the work jurisdiction of classified employees defined by Article IA, Section (a)</u>. . . .
>
> If Mine No. 27 were not permanently closed, i.e. if it were producing coal or were only temporarily idled, the work of dismantling and removing equipment from underground and moving it about the surface would be within the contractually-protected work jurisdiction of the members of the Local Union No. 2309 bargaining unit.  <u>Therefore, the question on which the outcome of this arbitration must turn becomes</u>:  <u>Is work of the type customarily performed by classified employees at a Mine when it is in production, or only temporarily idled, still within the Article IA, Section (a) work jurisdiction after that Mine is permanently closed with no possibility of reopening in the future</u>?"

* * * * *

> "Case No. 81-12-84-1360 resulted from a dispute that arose at Mine No. 27 in April, 1984 as to the performance of certain hoist operation work by a supervisor after the Mine was permanently closed in March, 1983.  It is clear that the work at issue in Case No. 81-12-84-1360 was considered to be classified work before the Mine was closed.  As noted earlier, in denying the grievance in that Case, Arbitrator Sinicropi stated:"

**[Quoted from above cited Exhibit #22]**

Then on page 13:

> "The critical issue here is whether under the Article IA, Section (a) work jurisdiction provision and related sections of the National Agreement, work that was

Page 46 of  64

classified work when the Mine was operational or temporarily idled **is still classified work after the Mine has been permanently closed with no prospect of being reopened**. The Award in Case No. 81-12-84-1360 addressed that question as it pertains to this bargaining relationship (Mine No. 27 and Local Union 2309) and answered it unequivocally in the negative. **Because the issue in this controversy has been once adjudicated between the local parties through operation of the binding arbitration mechanism that is part of the National Agreement, this Arbitrator is without authority to re-adjudicate it when no change in the relevant National Agreement language has taken place in the interim. To do so would eviscerate the finality of the contractual arbitration procedure.**" (emphasis added)

Our next citation, which is a decision of a previous Chief Umpire of the Interim Arbitration Review Board, was relied on in a very recent decision by Arbitrator John W. West at the McKinley Mine in October 2011. The West decision is included as our Exhibit #32 in these arguments. After reviewing the provisions of Article IA, Sections (a) and (c), Arbitrator Phelan held that the removal of water at this closed Mine is not related to the production of coal, therefore Article 1A (a) does not apply. It is important to see how he treats the past practice issue because of its importance to the issue herein.

Exhibit #27:   **D-881AA-25**
    Arbitrator Thomas M. Phelan in  <u>Consolidation Coal Company and UMWA Local Union 2412, District 12</u>, decided July 14, 1988.

See page 5:

> ". . . Briefly stated, Decision 78-26 requires first of all a showing that the disputed activity is classified work. On that issue, Article IA, Sections (a) and (c) are likely to be the primary contractual guides. Once there is a finding that classified work has been performed and it is found to have been performed in violation of the prohibition in Article IA, Section (c), then the right to be vindicated is that the work may not be performed by supervisors. . . ."

And on pages 6, 7 and 8:

> "... **It is clear that when the mine was operating, work involving the removal of water from the mine, including monitoring and maintenance of the pumps, was considered to be classified work.   The grievance settlements presented by the Union as exhibits here demonstrate that fact, and it was further confirmed by the testimony of the Union's witnesses.   At that time, work involving the removal of water from the mine was a regular part of the maintenance of the mine, and as indicated by the Union's witness, special efforts were sometimes even required to keep water out of the production shaft. All of these efforts were obviously geared toward facilitating production in the mine.**
>
> . . . **Further, it is obvious that this pumping is not to facilitate production in the mine because the mine has, in fact, been closed and sealed**. While the seal is not a permanent one, the sealing and capping of the mine does indicate that **the mine is no longer in production and that the pumping is not regular maintenance worked related to production**.
>
> The fact that production of coal at the mine has ceased does not, in my view, <u>necessarily</u> mean that the work jurisdiction of the classified Employees in the bargaining unit has also ceased.   That will depend, in large part, upon the circumstances in each individual case.   **Consideration would have to be given to the nature and purpose of the work performed, how closely associated it was to production activities, whether or not the work was required to be done in conjunction with or as a result of production activities, whether or not the mine was permanently closed, and other similar considerations**. . . .  Similarly, **activities which are considered to fall within the work jurisdiction of classified Employees** by reason of their being related to coal production **may have to be viewed differently when it is clear that there is to be no more production at the mine**.   Then, the work may take on a characterization as closure work, for example, or as security activities.  The discontinuance of production at the mine sometimes changes the nature of the work itself, and therefore such situations generally bear careful examination." (Underlining only by Arbitrator, other emphasis added)

Our next citation will be referred to later in our Exhibit #30 by Arbitrator Sedlmeier.  Arbitrator Judah addresses the discontinuation of past practice once a mine ceases the production of coal.

Exhibit #28:   **D-881AA-37**

Arbitrator Peter J. Judah in <u>Consolidation Coal Company and UMWA Local Union 2414, District 12</u>, decided October 17, 1988.

See pages 3, 4 and 5:

"<u>DISCUSSION</u>:

. . . In that connection, the reasoning of Arbitrator Phelan in the case referred to above is sound.  He stated at page 7.

> "<u>For example, past practice and customs which reflect agreed upon ways of doing things when the mine is operating may take on an entirely different character at a mine that is closed, and may not necessarily reflect the agreement of the parties under the different circumstances. Past practices and customs which apply in one set of circumstances are not automatically applied to an entirely different set of circumstances</u>.  Similarly, activities which are considered to fall within the work jurisdiction of classified Employees <u>by reason of their being related to coal production may have to be viewed differently when it is clear that there is to be no more production at the mine</u>.  Then, the work may take on a characterization as closure work, for example, or as security activities.  The discontinuance or production at the mine sometimes changes the nature of the work itself, and therefore such situations generally bear careful examination."

> <u>It will, in this arbitrator's opinion be generally difficult for the Union to  succeed in this type of claim</u>, <u>that is</u>, <u>where work jurisdiction grew out of a past practice and where there has been a complete and what appears to be permanent cessation in the production of coal at the mine</u>.  <u>That is so because there is generally "no past practice with regard to a closed mine"</u>.  <u>In order for the past practice to sustain the claim, all of the circumstances which gave rise to the practice must generally remain in place</u>.  The plain fact is that whereas, while the Company was operating the mine and coal was being produced, classified employees were available to perform the work and the practice was established, persumably (sic) based upon that availability.  If one side of that equation is removed, that is, no classified employee working, then it would be unfair and unreasonable to enforce the past practice.  In this connection, Arbitrator Harrison had this to say:

> "A binding practice or custom is after all, an agreement implied from the fact of a mutually acceptable unvarying response by the parties to a recurrent set of circumstances or conditions.  <u>The binding nature of the practice is no broader or more enduring than the circumstances under which it has arisen</u>.  To enforce the terms of the practice once the underlying circumstances or conditions have dissipated would be to force unintended terms upon the parties.  By sustaining the instant grievance, the Arbitrator would not be upholding the understanding reached and observed by the parties over many years, but would, instead, be dictating a new agreement of the parties.  That cannot be done.  The determination in this case must be that the Company is relieved of the obligation to assign the inspection duties in question to the bargaining unit during the period of the temporary shutdown."

> **<u>Because the shut down negates the past practice and because work involved here is clearly not work which comes within the ambit of Article IA, that is related to the production of coal, et cetera, the claim must fail on the basis that classified employees have no jurisdiction over the work in question</u>.**
> (Underlining only by Arbitrator, other emphasis added)

Our next citation is by another mainstream industry Arbitrator who holds that before work performed at a mine site is considered to be classified work, it must be related to the production of coal.

<u>Exhibit #29:</u>   **D-881AA-38**

Arbitrator Samuel J. Nicholas, Jr. in <u>Muskingum Mining Company and UMWA Local Union 1818, District 6</u>, decided November 15, 1988.

See pages 6, 7 and 8:

> ". . . At the same time, work jurisdiction is specifically governed by IA (a) <u>supra</u> and, to be sure, the "production of coal" or "repair and maintenance" performed at a mine site is to be done by classified employees.  **<u>Unquestionably</u>, "<u>production of coal</u>" is the key phrase in this governing provision, for all related activities of coal production under the concept of work jurisdiction are derived from these given words**.

> **<u>The so-called exemption clause of the Agreement,  Article IA (b)</u>** <u>supra</u>, **<u>expressly addresses the matter of employees who are employed under a</u>**

"**operating mine**". But with the subject mine not having been in operation since March, 1987, it can only be said that **the mine was not in a production mode**. **Therefore**, **it follows that Article IA (a) which clearly governs the production of coal and any related production activity, can only be said to be effective when production is had**. Accordingly, work which may have been classified while the given mine was in a production mode ceased to be so classified once Management concluded its mining operations.

. . . Nevertheless, **the fact remains that the mine was not in a state of production; thus, Article IA, (a) is not applicable here.** . . ."

Finally on page 9:

"In conclusion, and for the reasons so stated, **the Arbitrator holds that Article IA (a) is not binding upon Company for two reasons**: (1) **the mine was not in a production mode which is necessary in order for such a contractual provision to be deemed effective**; (2) the maintenance of the subject fresh water ponds has customarily been delegated to non-classified employees and which both parties have duly recognized prior to the filing of the instance grievance." (emphasis added)

Our next exhibit is by yet another veteran Arbitrator who finds that work must be related to the production of coal before it is considered to be classified work.

Exhibit #30:   **D-891AA-3**
Arbitrator Edward J. Sedlmeier <u>Consolidation Coal Company and UMWA Local Union 2414, District 12</u>, decided January 20, 1989.

See page 6:

"The Company asserts that the Wheeler Creek mine is closed and that, since there are no plans to reopen the mine, the Union ceases to have jurisdiction over the work done at the site. None of that work is related to the production of coal. . . ."

Then on pages 7 and 8:

"None of the work at Wheeler Creek, asserts the Company, is related to the production, processing or transportation of coal since the facility is not an operating coal mine. . . . The Company cites Arbitrator Thomas Phelan in 88-12-88-83 when he states:

> **Past practices and customs which apply in one set of circumstances are not automatically applied to an entirely different set of circumstances. Similarly, activities which are considered to fall within the work jurisdiction to coal production may have to be viewed differently when it is clear that there is to be no more production at the mine**.

Arbitrator Peter Judah, deciding a similar case at the Wheeler Creek mine (88-12-88-0106) stated:

> **It will, in this arbitrator's opinion be generally difficult for the Union to   succeed in this type of claim, that** is, **where work jurisdiction grew out of a past practice and where there has been a complete, and what appears to be permanent cessation in the production of coal at the mine**. **This is so because there is generally no past practice with regard to a closed mine**.

> **Because the shut down negates the past practice and because work involved here is clearly not work which comes within the ambit of Article IA, that is related to the production of coal**, **et cetera**, **the claim must fail on the basis that classified employees have no jurisdiction over the work in question**."

See pages 14 and 15:

"In my decision 88-12-88-107, I quoted a decision by Arbitrator Anthony Sinicropi.  That quote in part stated:

Although the work is clearly considered bargaining unit work while the mine was operational, the Company's unequivocal assertions that the mine has been permanently closed remove the work from Article IA, (a).  The work being performed by the Company cannot be said to be related to the production of coal when the Company has no intention of producing coal again at the mine.  Further, although Article IA (a) is broad and properly construed to include more than an operational mine, there must be some demonstration once a mine is "permanently closed" that the mine is being maintained in order to be operational in the future." (emphasis mine) (by Arbitrator)

In my previous decision (#107), I stated:

> **If the evidence in the record clearly and decisively led to the conclusion that the mine was permanently closed, I would find**

<u>the line of cases submitted by the Company and the logic of
Arbitrator Sinicropi to be persuasive</u>.

<u>I must now conclude that the evidence in the record does clearly and
decisively lead to the conclusion that the mine is closed</u>. . . .

DECISION AND AWARD

<u>The Company was not in violation of the National Bituminous Coal
Wage Agreement of 1988 when the belt rollers in question in this grievance
were loaded and hauled by non-classified personnel</u>.  The grievance is denied."
(Underlining only by Arbitrator, other emphasis added)

In our next citation the Arbitrator reviewed several of the decisions and rulings

cited herein, and held that the removal of mining equipment from a closed mine is not

protected work.   Sounds a lot like the Powhatan #6 Mine, doesn't it?

<u>Exhibit #31</u>:   **D-891AA-24**
Arbitrator John L. Davies in <u>Arch of West Virginia, Inc. and UMWA Local
Union 6712, District 17</u>, decided September 7, 1989.

See page 3:

> "The question before this Arbitrator is relatively simply (sic).  That is, **did
> Ramdu Inc. perform bargaining unit work when it removed mining
> equipment from the Hinchman Mine** in the period from January (sic **June**) 2,
> 1989 through January (sic **June**) 30, 1989. . . .
>
> The Union argues first that Hinchman Mine has not been permanently
> closed or abandoned by the Company and that therefore, the removal of mining
> equipment from the mine in that status is classified work. **The Company argues**
> to the contrary **that the mine is permanently closed."**

Then on pages 4 and 5:

> "1.     It was stipulated by the parties that the Hinchman Mine was shut down on
>         February 3, 1989.
>
> 2.     No coal has been produced in that mine since that date.

3.      All classified employees were laid off on February 3 and have not returned to work."

\* \* \* \* \*

"5.     Roger Crawford, Acting Mine Manager of the Hinchman Mine testified that after February 3, the Company tried to subcontract out the mine to another contractor, but failed.  He also testified that the Company tried to sell the mine, but failed.  Crawford testified that when the Company failed to sell or lease the mine, it decided to withdraw the equipment with intent to salvage.

6.      Crawford testified that the mine is permanently closed with intention of abandoning.  This is the present intention of the Company.

7.      Crawford testified that the Company intends to permanently seal the mine after the equipment is salvaged.

8.      Crawford (sic) that after Ramdu Inc. pulled the equipment during the month of June, there was not enough equipment left to operate the mine as a coal mine.

9.      Crawford testified that the two continuous miners were the first equipment pulled out by Ramdu, and once they came out the mine was not capable of producing coal."

On page 6:

"The Company argues to the contrary.  It states that when the mine is permanently closed, any removal of machinery therefrom, is not bargaining unit work and that the Company does have the right to subcontract out that work.  The Company submitted a number of arbitral decisions in support of this argument, which we shall proceed to quote from."

On page 12 and concluding on page 13:

". . . **The Arbitrators cited by the Company** on the other hand **state that the words "production of coal" are the key words to consider in interpreting Article IA (a) and that if production of coal has permanently ceased, then the removal of equipment from that permanently closed mine is not classified work;** in such case Company is not in violation of contract in giving that work to some person or organization other than classified employees. . . .

My job therefore, is to determine which line of reasoning I will adopt in reaching my decision in this case.  Suffice it to say that I have read and reread the

Page 54 of  64

decisions quoted herein and examined the rationale adopted in these decisions. The result is that **I find the opinions of the Arbitrators cited by the Company to be by far the most persuasive. As far as I am concerned, the words 'production of coal' in Article IA (a) constitute the key to arriving at a decision in this case. To constitute classified work under the contract, in order for work to be found to be classified work, that work must be actual production of coal or work reasonably related thereto as set forth in Article IA (a). The removal of mining equipment from a permanently closed mine, has no reasonable relationship to the production of coal. The mine has been permanently closed and no more coal will be produced in that mine. The removal of the equipment in that mine will not result in the production of one ounce of coal in that mine.** Actually a removal of mining equipment will result in <u>non</u> production of coal, rather than in the production of coal, the very opposite of what is covered in Article IA (a) of the contract. I come therefor, to the inevitable conclusion that the applicability of the provisions of Article IA (a) cease when the mine is permanently closed. **Inevitably then the classified employees of a Local Union have no right to claim the removal of the mining equipment as their work. The Bituminous Coal Wage Agreement does not apply to the work done by Ramdu Inc."** (Underlining only by Arbitrator, other emphasis added)

In our next decision, another Peabody mine ceased producing coal and had been permanently closed. In this decision the Arbitrator differentiates between permanent and temporary closures. He relies on and quotes from our two (2) previous citations <u>supra</u> to deny the grievance before him.

<u>Exhibit #32</u>: **D-981AA-4**
Arbitrator George V. Eyraud in <u>Peabody Coal Company and UMWA Local Union 8941, District 12</u>, decided June 12, 1998.

See pages 6 and 7:

<u>"DISCUSSION AND AWARD"</u>

\* \* \* \* \*

"The Union relies on Article IA, Section (a), <u>Work Jurisdiction</u>. **The thrust of Section (a) relates to "production of coal". Do any of the activities complained of here amount to the "production of coal" at Ken Mine. This Arbitrator thinks not under these facts.**

Page 55 of 64

The empirical facts of this matter are clear that there was a closing of this facility. The proper WARN Act notices were sent to all parties as required; **equipment, as best could be accomplished, was sent to other locations** of the Employer; the remaining equipment was inventoried, pelletized (sic) and sold at auction; the electrical power at the river dock for the tug was changed from 3 phase to single phase which prohibits loading at the dock; the warehouse and shop was cleared; . . ."

Then on page 8:

"The facts are clear that no KRA personnel performed any of the following: they performed no dozer work; no rough grading, no skidder work, no checking of pumps at the dock; no switching to activate the range; no pumping."

Then on pages 9 and 10:

"While the aforementioned work would have been under the jurisdiction of classified employees should the mine be running, jurisdiction changed once the mine was closed. **For a similar case see** <u>**Drummond Coal**</u> **vs** <u>**UMWA, Local 1554**</u>**, BE-10-194-92, Arbitrator Sergent, dated January 2, 1993 where it is stated, p 16, that "work which may have been classified while Beltona Mine was in a production mode ceased to be classified once mining operations were concluded** . . . ." See also <u>Peabody Coal and UMWA Local 1474</u>, NO 93-12-94-06, April 6, 1994 by Arbitrator Selby. **Another similar case was decided by Arbitrator Mann i.e.** <u>**Drummond Coal and UMWA, Local 1947**</u>**, 14 May 1992. In that case, as here, some reclamation work remained to be performed by classified employees at a later date. The case states, p 7:**

"**It is my opinion that after a mine has ceased extracting coal . . . and has laid off practically all employees in that coal extraction process, and there is no reasonable basis for concluding that there will be a resumption of the coal extraction process in the reasonable foreseeable future, then the collective bargaining agreement allows the Company to take the action the did. . . . .**"

**This Arbitrator adopts and agrees with the reasoning of the aforementioned Arbitrators. None of the actions described by the Union here, whether or not singularly enumerated by this Arbitrator, relate to the production of coal since it is believed that work jurisdiction is predicated on the theory of an operating facility and there clearly was not one here.**

For the above reasons, <u>the grievance is denied and the actions of Management upheld</u>." (Underlining by Arbitrator, other emphasis added)

Page 56 of 64

We now turn to another Peabody Coal Company decision at their closed Gibralter Mine in July 2004.  The decision of Arbitrator Michael Zobrak is consistent with the other authority cited herein.

Exhibit #33: **D-20041AA-3**
    Arbitrator Michael E. Zobrak in <u>Peabody Coal Company and UMWA Local Union 1092, District 12</u>, decided July 23, 2004.

See pages 5, 6 and 7:

"**<u>CONTENTIONS OF THE PARTIES</u>**

**<u>UNION CONTENTIONS</u>**

The Union contends that the provisions of the National Agreement (Agreement) of 2002, as well as the past practice and custom at the mine, do not allow the Company to disregard the work jurisdiction rights of the employees of that Mine. It is clear that the employees of the Gibraltar Mine historically operated the belt line, even when Carbon's products were being moved on the belts. Company cannot unilaterally change such a past practice and custom.  By assigning the operation of the belt line to employees of Carbon, the Company had diminished the work jurisdiction of the employees of the Gibraltar Mine. . . .

**<u>COMPANY CONTENTIONS</u>**

The Company takes the position that its actions in this dispute do not violate the terms of the National Agreement.   This is a unique case with special circumstance. **<u>Production at the Mine has ceased</u>**.  The preparation plant has been torn down.  The only work being done by employees of Carbon is the starting and stopping of the belts.  **<u>The Union cannot rely upon a prior practice and custom since the Mine was closed</u>**. . . . **<u>The starting and stopping of the belts is done solely for the benefit of Carbon, by its own employees</u>**.  **<u>The basis for any prior practice and custom changed once the Mine was closed</u>** and the preparation plant was dismantled. . . . **<u>Any prior practices and customs ceased when the mine was taken out of production</u>**. . . .

**<u>DISCUSSION AND FINDINGS</u>**

**<u>There is no dispute that production at the Gibraltar Mine has permanently ceased</u>** and that reclamation work at that location has been completed.

Page 57 of  64

. . . **While production at the Mine has ceased, Carbon continues to produce its own products on land leased from the Company**.

The belt line is now being used solely to transport product belonging to Carbon. None of the product being moved on the belt has any relationship with the former production operations of the Gibraltar Mine. The preparation plant, which was the operations location for the belt line, no longer exists. **Prior practices and customs must be observed as long as the conditions giving rise to the prior practices and customs exist**. **In this case, with the permanent closing of the Mine and the demolition of the preparation plant, the conditions that gave rise to the prior practice and custom no longer exist**."

\* \* \* \* \*

"**The Union's work jurisdiction flows from the provision of Article IA, Section (a) of the National Agreement. The work jurisdiction is premised on the designation that the operation is engaged in "The production of coal**." Also included in the work jurisdiction are other activities related to "the production of coal." **At the Gibraltar Mine coal production has been permanently halted**. As such, the work jurisdiction of the employees of the Mine has been severely limited. Among those limitations is work related to the no-longer existent preparation plant, where the belt line controls were located. **Without an operational mine, or even an operational preparation plant in this instance, it must be concluded that any claim of a prior practice and custom is negated**.

Based on the unique circumstances existing at the Gibraltar Mine, as cited herein, the remedy sought by this grievance cannot be granted." (emphasis added)

We now turn to the Beckman decision that we referred to earlier in these arguments. This decision is one of the more extensive decisions ever written by any Arbitrator under NBCWAs, in my experience. In it, Arbitrator Beckman sets up and answers five (5) significant questions, many of which have application at this permanently closed Powhatan No. 6 Mine. This decision should be given strong weight for several reasons, the first of which is the background and experience of Arbitrator Beckman in the coal industry. He has served as a Panel Arbitrator

continuously since 1976 and has written more than eight hundred (800) coal industry

decisions.   As you will see, the case is thoroughly researched. [See pages 28-38 for

his analysis of forty-six (46) submissions by the Employer and pages 41-44 for his

analysis of thirteen (13) submissions by the Union.] His findings that, in the absence

of an applicable Arbitration Review Board Decision, contract interpretations must be

made in accordance with the law, and the Courts (and mainstream coal industry

Arbitrators) have settled the questions related to jurisdictional issues at closed mines.

Exhibit #34: **D-20042B-2**
Arbitrator David L. Beckman in Jim Walter Resources, Inc. and UMWA Local
Union 1928, District 20, decided October 25, 2004.

See page 18 for the questions to be answered:

> "The task of the arbitrator is to determine whether JWR failed to follow the
> agreement it made with the UMWA.   In carrying out this task, it is necessary to
> confront the following questions: (1) **Is Mine No. 3 closed?**   (2) Is Eagle North
> America a "successor" or "assign" as those terms are used in Article I? (3) Does this
> case involve the transfer of an "operation" as that term is used in Article I? (4) Do
> the laid-off classified employees of Mine No. 3 have a right to be "recalled" to the
> work being performed by Eagle North America, Inc. at Mine No. 3? (5) Did the
> Employer comply with Article II of the 2002 Agreement?"

See pages 23 and 24 for the Closed Mine issue:

> "Is Mine No. 3 Permanently Closed?
>
> **The Company has asserted that Mine No. 3 is permanently closed, and
> suggests that this fact should make a difference**.  The evidence is clear that **Mine
> No. 3 is not now in operation**.  **It was closed down in 1999**, and in November
> 1999, the Employer completed the process of closing the mine, as required by law.
> It may well be the intent of the employer that Mine No. 3 is permanently closed, but
> as a factual matter, **all I can say is that the mine is now closed and has been closed
> since November of 1999, and the Employer has no current intent to resume
> operations**. . . .

The arguments of the Employer have persuasive value, but **it is not clear to what extent the mine closure has a bearing on the instant case, until a full review is made of the cases submitted by the Employer**. **It may well be that the specification that rough grading in mine reclamation work may not be contracted out contains an inference which may have a bearing on the instant case, but in view of the limiting effect of the word "operations" in Article I, the fact that a mine has ceased operations, and the fact that "coal production" has ceased are facts that matter when making a determination of the obligations of the Employer under Article I and IA.**

**The cases submitted by the Employer, which are set forth below in brief form, track the development of the issues with respect to closed mines and contracted operations which follow shutdowns and layoffs**. While it is possible that Mine No. 3 could be reopened in the future, it is clear for all practical purposes that such a remote possibility has no bearing on the decision required to resolve the instant grievances. The question is this: **Given the current closed state of Mine No. 3, what is the effect, if any, of the activity the Employer has allowed to go on at the mine site**?"

Then beginning on page 28 for authorities presented by the Employer:

"**The Authorities Cited by the Employer**

Counsel for the Employer presented the following authorities in support of its position that the Employer did not violate the 2002 Agreement with the United Mine Workers of America. **Below I have briefed the cases and in some instances added my comment in NOTES regarding the case and its relationship to the instant JWR case**:"

Arbitrator Beckman then cites summaries along with his own notes for forty-six (46) prior authorities (omitted here). Most, if not all, of those authorities are cited earlier in these arguments.

After citing the Union's submissions on pages 41, 42, 43 and 44 he stated the following on page 45:

"**In contrast to the aforesaid cases, I have found the reasoning in some of the cases submitted by the Employer to be very persuasive**. . . ."

Page 60 of  64

Then see pages 46 and 47 on **"The Effect of Settled Law"** . . .:

"**The Effect of Settled Law on the Instant Case**

**A District Arbitrator is under an obligation to follow the holdings of the Arbitration Review Board. Further, one of the principles of contract interpretation is that an arbitrator will interpret ambiguous language in the light of the law.** Since there is no Arbitration Review Board for the arguments which have arisen since its termination in (sic) after the 1978 National Agreement, **I find that it is reasonable for a District Arbitrator to be guided by settled law**. In reviewing the sixty cases which were submitted by the parties, **several arguments may be said to be settled**. The first argument I refer to is the question whether an Employer has a contract obligation to require entities other than successors and assigns who purchase ongoing operations to assume the Employer's obligation under the Agreement. This argument has been settled by the courts. Starting on page 28 hereof, Cases (1), (2), (3), (4), (5), (6), (8) and (9) put to rest the argument that JWR had an obligation to require ENA to assume JWR's obligations under the 2002 Agreement. Under the law, it is clear that JWR had no such obligation. **Accordingly, this arbitrator, in the process of interpreting the Agreement in the light of the law, must reasonably take notice of and apply the settled law on that issue**.

**The other argument that must be considered settled is the inference that the Employer has the same obligations after a mine is closed as it had when the mine was in operation. To the contrary, the arbitral authorities are clear that after a mine is closed, the practices which existed and had binding effect when the mine was in operation are not subject to enforcement, because there has been a significant change in the facts which supported the application of the practice in the first place. The significant change is the fact that the mine is closed**."

Then on page 49 for Arbitrator Beckman's "Conclusion":

"**Conclusion**

The evidence in this case establishes that JWR had no contractual obligation to secure the agreement of ENA to assume JWR's obligations under the 2002 Agreement. The contract and its addendum between JWR and ENA involving the removal of coal fines from ponds existing on Mine No. 3 property did not violate Article I, IA (a) or (g), XVII, XXIII (k), or any other articles or sections of the 2002 Agreement. **Accordingly, the grievances are without merit and must be denied**." (Subtitles bolded by Arbitrator, all other emphasis added)

When you apply the principles set out by the various authorities referred to in these arguments and on pages 28 through 38 of Arbitrator Beckman's decision, along with his conclusions, it should be clear that except for rough grading, none of the work described in Article 1A, Section (a) of the 2016 CWA, can possibly survive the permanent cessation of all production at this permanently closed Powhatan No. 6 Mine.

The last decision in this Part of these Arguments is one decided in October 2011 by Arbitrator John S. West, at the permanently closed McKinley Mine in New Mexico. You will note that I was the Advocate for the Employer. Arbitrator West was provided with much of the Court and Arbitral authority being presented to you today. Although he had written somewhat negatively on the "closed mine" subject in the UMWA's favor at Consol's Ireland Mine in 1996, and a contrary opinion at the McKinley Mine in 2001, after reviewing many of the decisions cited in this paper, he denied claims to work jurisdiction in this instance. He relied on a decision by former Chief Umpire Phelan, both in his 2001 decision to rule for the Union, and then to rule for the Employer in the next decision.

Exhibit 35: D-20111AA-1
    Arbitrator John S. West in Chevron Mining - McKinley Mine and UMWA District 22, Local 1332, decided on October 14, 2011.

See pages 17 & 18:

Article AI, Section (a) of the Contract provides for the maintenance of mine roads **during the production of coal**. Such work falls under the exclusive jurisdiction of the classified employees. The nature and purpose of the work being performed herein was the maintenance of the mine roads. The material used (which is primarily soil) on the roads and the material which falls from the vehicle which travel the roads result in runoff during a rain event. Again, the primary purpose of the ponds herein is to prevent or maintain that **run off or sediment** from the mine roads from entering into the nearby waterways.

**The mine roads have not been used for coal production for approximately one and one half years prior to the work at issue being done. The mine roads ceased to be roads for the purpose of transporting coal during production and became roads to transport equipment for the purpose of reclamation work or sale. As stated by Arbitrator Phelan** ... activities which we considered to fall within the work jurisdiction of classified Employees by reason of their being related to coal production may have to be viewed differently when it is clear that there is no more production at the mine." **Rather than the mine roads being maintained for the purpose of production, they were, at that time, being maintained for the purpose of mining equipment for reclamation work and sale. Mine roads, unlike gob piles or spoils are more likely to have a useful purpose apart from production activities. The work at issue has taken on a characterization as closure work and is no longer work in conjunction with production activity.**

Article IA, Section (g) (2) prevents the Company from ". . . contract[ing] out the rough grading in mine reclamation work." **The work herein was not "rough grading in mine reclamation work; rather, it was work related to the maintenance of mine roads for the purpose of closure**. **Additionally, while the classified employees performed the work at issue while the mine was in production, the Mine is now closed and the work was performed for a different purpose**." (emphasis added)

Based upon the evidence in the record and the arbitral and Court authority cited in these Arguments, we respectfully request that you rule that the Union has not proven that the Employer violated any of the terms of 2016 CWA in the matter before you here today....

We urge a finding on the procedural issue that Articles 1A(a), Article 1A(g), (1) & (2), and Article 1a (i) no longer have any application at this permanently closed Powhatan No. 6 Mine.

We also submit that even if you somehow find that the Employer violated some term of the 2016 CWA, neither Grievant has proven that they suffered a monetary loss, which would entitle them to be awarded a monetary remedy, and **punitive damages are not proper in Arbitration**.  As such, we respectfully request that you dismiss the instant grievance as being without contractual merit.

Thank you Arbitrator Bowers.